## SCHWEGMANN BROTHERS ET AL. *v.* CALVERT DISTILLERS CORP.

NO. 442.

Argued April 9–10, 1951.—Decided May 21, 1951.

*John Minor Wisdom* and *Saul Stone* argued the cause and filed a brief for petitioners.

*Monte M. Lemann* argued the cause for respondents. With him on the brief were *Thomas Kiernan, Edgar E. Barton, J. Blanc Monroe* and *Walter J. Suthon, Jr.*

*Solicitor General Perlman, Assistant Attorney General Morison, Robert L. Stern, Charles H. Weston* and *J. Roger Wollenberg* filed a brief for the United States, as *amicus curiae,* urging reversal.

Briefs of *amici curiae* supporting respondents were filed by *Robert E. Woodside,* Attorney General, and *Harry F. Stambaugh* for the State of Pennsylvania; *Samuel I. Rosenman, Godfrey Goldmark* and *Herman S. Waller* for the National Assn. of Retail Druggists et al.; *Herbert A. Bergson* for Coty Incorporated et al.; and by *Murray F. Cleveland* for the Louisiana State Pharmaceutical Association.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondents, Maryland and Delaware corporations, are distributors of gin and whiskey. They sell their products to wholesalers in Louisiana, who in turn sell to retailers. Respondents have a price-fixing scheme whereby they try to maintain uniform retail prices for their products. They endeavor to make retailers sign price-fixing contracts under which the buyers promise to sell at not less than the prices stated in respondents' schedules. They have indeed succeeded in getting over one hundred Louisiana retailers to sign these agreements. Petitioner, a retailer in New Orleans, refused to agree to the price-fixing scheme and sold respondents' products at a cut-rate price. Respondents thereupon brought this suit in the District Court by reason of diversity of citizen-

ship to enjoin petitioner from selling the products at less than the minimum prices fixed by their schedules.

It is clear from our decisions under the Sherman Act (26 Stat. 209) that this interstate marketing arrangement would be illegal, that it would be enjoined, that it would draw civil and criminal penalties, and that no court would enforce it. Fixing minimum prices, like other types of price fixing, is illegal *per se*. *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150; *Kiefer-Stewart Co.* v. *Seagram & Sons*, 340 U. S. 211. Resale price maintenance was indeed struck down in *Dr. Miles Medical Co.* v. *Park & Sons Co.*, 220 U. S. 373. The fact that a state authorizes the price fixing does not, of course, give immunity to the scheme, absent approval by Congress.

Respondents, however, seek to find legality for this marketing arrangement in the Miller-Tydings Act enacted in 1937 as an amendment to § 1 of the Sherman Act. 50 Stat. 693, 15 U. S. C. § 1. That amendment provides in material part that "nothing herein contained shall render illegal, *contracts or agreements* prescribing minimum prices for the resale" of specified commodities when "*contracts or agreements of that description* are lawful as applied to intrastate transactions" under local law.[1] (Italics added.)

Louisiana has such a law. La. Gen. Stat., §§ 9809.1 *et seq.* It permits a "contract" for the sale or resale of a commodity to provide that the buyer will not resell "except at the price stipulated by the vendor." The

---

[1] Resale price maintenance is allowed only as respects commodities which bear, or the label or container of which bear, the trade mark, brand, or name of the producer or distributor and which are in free and open competition with commodities of the same general class produced or distributed by others. Excluded are agreements between manufacturers, between producers, between wholesalers, between brokers, between factors, between retailers or between persons, firms or corporations in competition with each other.

Louisiana statute goes further. It not only allows a distributor and retailer to make a "contract" fixing the resale price; but once there is a price-fixing "contract," known to a seller, with any retailer in the state, it also condemns as unfair competition a sale at less than the price stipulated even though the seller is not a party to the "contract." [2] In other words, the Louisiana statute enforces price fixing not only against parties to a "contract" but also against nonsigners. So far as Louisiana law is concerned, price fixing can be enforced against all retailers once any single retailer agrees with a distributor on the resale price. And the argument is that the Miller-Tydings Act permits the same range of price fixing.

The argument is phrased as follows: the present action is outlawed by the Sherman Act—the Miller-Tydings Act apart—only if it is a contract, combination, or conspiracy in restraint of trade. But if a contract or agreement is the vice, then by the terms of the Miller-Tydings Act that contract or agreement is immunized, provided it is immunized by state law. The same is true if the vice is a conspiracy, since a conspiracy presupposes an agreement. That was in essence the view of the Court of Appeals, which affirmed by a divided vote a judgment of a district court enjoining petitioner from price cutting. 184 F. 2d 11.

The argument at first blush has appeal. But we think it offends the statutory scheme.

We note to begin with that there are critical differences between Louisiana's law and the Miller-Tydings Act.

---

[2] The nonsigner clause in the Louisiana Act reads as follows: "Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provision of section 1 [§ 9809.1] of this act, *whether the person so advertising, offering for sale or selling is or is not a party to such contract,* is unfair competition and is actionable at the suit of any person damaged thereby."

The latter exempts only "contracts or agreements prescribing minimum prices for the resale." On the other hand, the Louisiana law sanctions the fixing of maximum as well as minimum prices, for it exempts any provision that the buyer will not resell "except at the price stipulated by the vendor." We start then with a federal act which does not, as respondents suggest, turn over to the states the handling of the whole problem of resale price maintenance on this type of commodity. What is granted is a limited immunity—a limitation that is further emphasized by the inclusion in the state law and the exclusion from the federal law of the nonsigner provision. The omission of the nonsigner provision from the federal law is fatal to respondents' position unless we are to perform a distinct legislative function by reading into the Act a provision that was meticulously omitted from it.

A refusal to read the nonsigner provision into the Miller-Tydings Act makes sense if we are to take the words of the statute in their normal and customary meaning. The Act sanctions only "contracts or agreements." If a distributor and one or more retailers want to agree, combine, or conspire to fix a minimum price, they can do so if state law permits. Their contract, combination, or conspiracy—hitherto illegal—is made lawful. They can fix minimum prices pursuant to their contract or agreement with impunity. When they seek, however, to impose price fixing on persons who have not contracted or agreed to the scheme, the situation is vastly different. That is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement; that is resort to coercion.

Much argument is made to import into the contracts which respondents make with retailers a provision that the parties may force nonsigners into line. It is said that state law attaches that condition to every such con-

tract and that therefore the Miller-Tydings Act exempts it from the Sherman Act. Such a condition, if implied, creates an agreement respecting not sales made under the contract but other sales. Yet all that are exempted by the Miller-Tydings Act are "contracts or agreements prescribing minimum prices for the resale" of the articles purchased, not "contracts or agreements" respecting the practices of noncontracting competitors of the contracting retailers.

It should be noted in this connection that the Miller-Tydings Act expressly continues the prohibitions of the Sherman Act against "horizontal" price fixing by those in competition with each other at the same functional level.[3] Therefore, when a state compels retailers to follow a parallel price policy, it demands private conduct which the Sherman Act forbids. See *Parker* v. *Brown,* 317 U. S. 341, 350. Elimination of price competition at the retail level may, of course, lawfully result if a distributor successfully negotiates individual "vertical" agreements with all his retailers. But when retailers are *forced* to abandon price competition, they are driven into a compact in violation of the spirit of the proviso which forbids "horizontal" price fixing. A real sanction can be given the prohibitions of the proviso only if the price maintenance power granted a distributor is limited to *voluntary* engagements. Otherwise, the exception swallows the proviso and destroys its practical effectiveness.

The contrary conclusion would have a vast and devastating effect on Sherman Act policies. If it were adopted, once a distributor executed a contract with a

---

[3] *"Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, . . . or between retailers, or between persons, firms, or corporations in competition with each other." 15 U. S. C. § 1.

single retailer setting the minimum resale price for a commodity in the state, all other retailers could be forced into line. Had Congress desired to eliminate the consensual element from the arrangement and to permit blanketing a state with resale price fixing if only one retailer wanted it, we feel that different measures would have been adopted—either a nonsigner provision would have been included or resale price fixing would have been authorized without more. Certainly the words used connote a voluntary scheme. Contracts or agreements convey the idea of a cooperative arrangement, not a program whereby recalcitrants are dragged in by the heels and compelled to submit to price fixing.

The history of the Act supports this construction. The efforts to override the rule of *Dr. Miles Medical Co.* v. *Park & Sons Co., supra,* were long and persistent. Many bills had been introduced on this subject before Senator Tydings introduced his. Thus in 1929, in the Seventy-First Congress, the Capper-Kelly fair trade bill was offered.[4] It had no nonsigner provision. It merely permitted resale price maintenance as respects specified classes of commodities by declaring that no such "contract relating to the sale or resale" shall be unlawful. As stated in the House Report, that bill merely legalized an agreement "that the vendee will not resell the commodity specified in the contract except at a stipulated price." [5] That bill became the model for the California act passed in 1931—the first state act permitting resale price maintenance.[6] The California act contained no nonsigner clause. Neither did the Capper-Kelly bill that

---

[4] S. 240, 71st Cong., 1st Sess.; H. R. 11, 71st Cong., 1st Sess. See H. R. Rep. No. 536, 71st Cong., 2d Sess.

[5] H. R. Rep. No. 536, 71st Cong., 2d Sess. 2.

[6] Cal. Stat., 1931, c. 278. The California Act was sometimes known as "the Junior Capper-Kelly." See Grether, Price Control Under Fair Trade Legislation (1939), p. 54.

was introduced in the Seventy-Second Congress.[7]   So far as material here it was identical with its predecessor.

The Capper-Kelly bill did not pass.   And by the time the next bill was introduced—three years later—the California act had been changed by the addition of the nonsigner provision.[8]   That was in 1933.   Yet when in 1936 Senator Tydings introduced his first bill in the Seventy-Fourth Congress [9] he followed substantially the Capper-Kelly bills and wrote no nonsigner provision into it.   His bill merely legalized "contracts or agreements prescribing minimum prices or other conditions for the resale" of a commodity.   By this date several additional states had resale price maintenance laws with nonsigner provisions.[10]   Even though the state laws were the models for the federal bills, the nonsigner provision was never added.   That was true of the bill introduced in the Seventy-Fifth Congress as well as the subsequent one.   They all followed in this respect the pattern of the Capper-Kelly bill as it appeared before the first nonsigner provision was written into state law.   The "contract" concept utilized by Capper-Kelly before there was a nonsigner provision in state law was thus continued even after the nonsigner provision appeared.   The inference, therefore, is strong that there was continuity between the first Tydings bill and the preceding Capper-Kelly bills.   The Tydings bills built on the same foundation; they were no more concerned with nonsigner provisions than were their predecessors.   In view of this history we can only conclude that, if the

---

[7] S. 97, 72d Cong., 1st Sess.; H. R. 11, 72d Cong., 1st Sess.

[8] Cal. Stat., 1933, c. 260: The California law is now found in Business & Professions Code, Pt. 2, c. 3, § 16904.

[9] S. 3822, 74th Cong., 2d Sess., 80 Cong. Rec. 1007.

[10] See Ill. Laws 1935, p. 1436; Iowa Laws 1935, c. 106; Md. Laws 1935, c. 212, § 2; N. J. Laws 1935, c. 58, § 2; N. Y. Laws 1935, c. 976, § 2; Ore. Laws 1935, c. 295, § 2; Pa. Laws 1935, No. 115, § 2; Wash. Laws 1935, c. 177, § 4; Wis. Laws 1935, c. 52.

392

draftsman intended that the nonsigning retailer was to be coerced, it was strange indeed that he omitted the one clear provision that would have accomplished that result.

An argument is made from the reports and debates to the effect that "contracts or agreements" nevertheless includes the nonsigner provisions of state law. The Senate Report on the first Tydings bill, after stating that the California law authorized a distributor "to make a contract that the purchaser will not resell" except at the stipulated price, said that the proposed federal law "does no more than to remove Federal obstacles to the enforcement of contracts which the States themselves have declared lawful." [11] The Senate Report on the second Tydings bill, which was introduced in the Seventy-fifth Congress, did little more than reprint the earlier report.[12] The House Report, heavily relied on here, gave a more extended analysis.[13]

The House Report referred to the state fair trade acts as authorizing the maintenance of resale prices by contract and as providing that "third parties with notice are bound by the terms of such a contract regardless of whether they are parties to it"; and the Report also stated that the objective of the Act was to permit the public policy of the states having such acts to operate with respect to interstate contracts for the sale of goods.[14] This Report is the strongest statement for respondents' position which is found in the legislative history. The bill which that Report endorsed, however, did not pass. The bill which became the law was attached by the Senate Committee on the District of Columbia as a rider to the District of Columbia revenue bill. In that form it was debated and passed.

---

[11] S. Rep. No. 2053, 74th Cong., 2d Sess. 2.

[12] S. Rep. No. 257, 75th Cong., 1st Sess.

[13] H. R. Rep. No. 382, 75th Cong., 1st Sess.

[14] *Id.*, p. 2.

It is true that the House Report quoted above[15] was referred to when the Senate amendment to the revenue measure was before the House.[16] And one Congressman in the debate said that the nonsigner provision of state laws was validated by the federal law.

But we do not take these remarks at face value. In the first place, the House Report, while referring to the nonsigner provision when describing a typical state fair trade act, is so drafted that the voluntary contract is the core of the argument for the bill. Hence, the General Statement in the Report states that the sole objective of the Act was "to permit the public policy of States having 'fair trade acts' to operate with respect to interstate *contracts* for the resale of goods"; and the fair trade acts are referred to as legalizing "the maintenance, *by contract,* of resale prices of branded or trade-marked goods." [17] (Italics added.)

In the second place, the remarks relied on were not only about a bill on which no vote was taken; they were about a bill which sanctioned "contracts or agreements" prescribing not only "minimum prices" but "other conditions" as well. The words "other conditions" were dropped from the amendment that was made to the revenue bill. Why they were deleted does not appear. It is said that they have no relevance to the present problem, since we are dealing here with "minimum prices" not with "other conditions." But that answer does not quite hold. The question is the amount of state law embraced in the words "contracts or agreements." It might well be argued that one of the "conditions" attaching to a contract fixing a minimum price would be the liability of a nonsigner.

---

[15] *Id.*

[16] See, *e. g.,* the statement of Rep. Dirksen, a House conferee, in 81 Cong. Rec. 8138.

[17] H. R. Rep. No. 382, 75th Cong., 1st Sess. 2.

We do no more than stir the doubt, for the doubt alone is enough to make us skeptical of the full implications of the old report as applied to a new and different bill.

We look for more definite clues; and we find the following statement made on the floor by Senator Tydings: "What does the amendment do? It permits a man who manufactures an article to state the minimum resale price of the article in a contract with the man who buys it for ultimate resale to the public . . . ."[18] Not once did Senator Tydings refer to the nonsigner provisions of state law. Not once did he suggest that the amendment would affect anyone but the retailer who signs the contract. We search the words of the sponsors for a clear indication that coercive as well as voluntary schemes or arrangements are permissible. We find none.[19] What we do find is the expression of fear in the minority report of the Senate Committee that the nonsigner provisions of the state laws would be made effective if the law passed.[20] These fears were presented in the Senate debate by Senator King in opposition to the amendment.[21] But the Senate Report emphasizes the "permissive" nature of the state laws,[22] not once pointing to their coercive features.

The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statu-

---

[18] 81 Cong. Rec. 7495.

[19] H. R. Rep. No. 1413, 75th Cong., 1st Sess. 10 (the Conference Report of the House) merely stated: "This amendment provides for an amendment to the antitrust laws under which contracts and agreements stipulating minimum resale prices of certain commodities, and which are similar to contracts and agreements which are lawful as applied to intrastate commerce, are not to be regarded as being illegal under the antitrust laws."

[20] S. Rep. No. 879, 75th Cong., 1st Sess.

[21] 81 Cong. Rec. 7491. And see S. Rep. No. 879, Part 2, 75th Cong., 1st Sess.

[22] S. Rep. No. 879, 75th Cong., 1st Sess. 6.

tory words is in doubt. And when we read what the sponsors wrote and said about the amendment, we cannot find that the distributors were to have the right to use not only a *contract* to fix retail prices but a *club* as well. The words they used—"contracts or agreements"—suggest just the contrary.

It should be remembered that it was the state laws that the federal law was designed to accommodate. Federal regulation was to give way to state regulation. When state regulation provided for resale price maintenance by both those who contracted and those who did not, and the federal regulation was relaxed only as respects "contracts or agreements," the inference is strong that Congress left the noncontracting group to be governed by preexisting law. In other words, since Congress was writing a law to meet the specifications of state law, it would seem that if the nonsigner provision as well as the "contract" provision of state law were to be written into federal law, the pattern of the legislation would have been different.

We could conclude that Congress carved out the vast exception from the Sherman Act now claimed only if we were willing to assume that it took a devious route and yet failed to make its purpose plain.

*Reversed.*

MR. JUSTICE JACKSON, whom MR. JUSTICE MINTON joins, concurring.

I agree with the Court's judgment and with its opinion insofar as it rests upon the language of the Miller-Tydings Act. But it does not appear that there is either necessity or propriety in going back of it into legislative history.

Resort to legislative history is only justified where the face of the Act is inescapably ambiguous, and then I think we should not go beyond Committee reports, which presumably are well considered and carefully prepared.

I cannot deny that I have sometimes offended against that rule. But to select casual statements from floor debates, not always distinguished for candor or accuracy, as a basis for making up our minds what law Congress intended to enact is to substitute ourselves for the Congress in one of its important functions. The Rules of the House and Senate, with the sanction of the Constitution, require three readings of an Act in each House before final enactment. That is intended, I take it, to make sure that each House knows what it is passing and passes what it wants, and that what is enacted was formally reduced to writing. It is the business of Congress to sum up its own debates in its legislation. Moreover, it is only the words of the bill that have presidential approval, where that approval is given. It is not to be supposed that, in signing a bill, the President endorses the whole Congressional Record. For us to undertake to reconstruct an enactment from legislative history is merely to involve the Court in political controversies which are quite proper in the enactment of a bill but should have no place in its interpretation.

Moreover, there are practical reasons why we should accept whenever possible the meaning which an enactment reveals on its face. Laws are intended for all of our people to live by; and the people go to law offices to learn what their rights under those laws are. Here is a controversy which affects every little merchant in many States. Aside from a few offices in the larger cities, the materials of legislative history are not available to the lawyer who can afford neither the cost of acquisition, the cost of housing, or the cost of repeatedly examining the whole congressional history. Moreover, if he could, he would not know any way of anticipating what would impress enough members of the Court to be controlling. To accept legislative debates to modify statutory provi-

sions is to make the law inaccessible to a large part of the country.

By and large, I think our function was well stated by Mr. Justice Holmes: "We do not inquire what the legislature meant; we ask only what the statute means." Holmes, Collected Legal Papers, 207. See also *Soon Hing* v. *Crowley,* 113 U. S. 703, 710–711. And I can think of no better example of legislative history that is unedifying and unilluminating than that of the Act before us.

MR. JUSTICE FRANKFURTER, whom MR. JUSTICE BLACK and MR. JUSTICE BURTON join, dissenting.

In 1890, Congress passed the Sherman Law, which declared illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." Act of July 2, 1890, § 1, 26 Stat. 209, 15 U. S. C. § 1. In 1937, Congress passed the Miller-Tydings Amendment. This excepted from the Sherman Law "contracts or agreements" prescribing minimum prices for the resale of trade-marked commodities where such contracts or agreements were valid under State statute or policy. Act of Aug. 17, 1937, Title VIII, 50 Stat. 673, 693, 15 U. S. C. § 1. It would appear that, insofar as the Sherman Law made maintenance of minimum resále prices illegal, the Miller-Tydings Amendment made it legal to the extent that State law legalized it. "Contracts or agreements" immunized by the Miller-Tydings Amendment surely cannot have a narrower scope than "contract, combination . . . or conspiracy" in the Sherman Law. The Miller-Tydings Amendment is an amendment to § 1 of the Sherman Law. The category of contract cannot be given different content in the very same section of the same act, and every combination or conspiracy implies an agreement.

The setting of the Miller-Tydings Amendment and its legislative history remove any lingering doubts. The depression following 1929 gave impetus to the movement for legislation which would allow the fixing of minimum resale prices. In 1931, California passed a statute allowing a manufacturer to establish resale prices binding only upon retailers who voluntarily entered into a contract with him. This proved completely ineffective, and in 1933 California amended her statute to provide that such a contract established a minimum price binding upon any person who had notice of the contract. Grether, Experience in California with Fair Trade Legislation Restricting Price Cutting, 24 Calif. L. Rev. 640, 644 (1936). This amendment was the so-called "non-signer" clause which, in effect, allowed a manufacturer or wholesaler to fix a minimum resale price for his product. Every "fair trade" law thereafter passed by any State contained this "non-signer" clause. By the close of 1936, 14 States had passed such laws. In 1937, 28 more States passed them. Today, 45 out of 48 States have "fair trade" laws. See Report of the Federal Trade Commission on Resale Price Maintenance XXVII (Dec. 13, 1945).

A substantial obstacle remained in the path of the "fair trade" movement. In 1911, we had decided *Dr. Miles Medical Co.* v. *Park & Sons Co.,* 220 U. S. 373. There, in a suit brought against a "non-signer," we held that an agreement to maintain resale prices was a "contract . . . in restraint of trade" which was contrary to the Sherman Law. To remove this block, the Miller-Tydings Amendment was enacted. It is said, however, that thereby Congress meant only to remove the bar of the Sherman Law from agreements between the manufacturer and retailer, that Congress did not mean to make valid the "non-signer" clause which formed an integral part of each of the 42 State statutes in effect when the Amendment was passed.

The Miller-Tydings Amendment was passed as a rider to a Revenue Bill for the District of Columbia. The Senate Committee which attached the rider referred the Senate to S. Rep. No. 2053, 74th Cong., 2d Sess.[1] The House Conference Report (H. R. Rep. No. 1413, 75th Cong., 1st Sess.), contains only five lines concerning the rider. But the rider was not a new measure. It came as no surprise to the House, which already had before it practically the same language in the Miller Bill, reported favorably by the Committee on the Judiciary. H. R. Rep. No. 382, 75th Cong., 1st Sess. Both the House and Senate, therefore, had before them reports dealing with the substance of the Miller-Tydings Amendment. These reports speak for themselves, and I attach them as appendices to this opinion, *post,* p. 402. Every State act referred to in these reports contained a "non-signer" provision. I cannot see how, in view of these reports, we can conclude that Congress meant the "non-signer" provisions to be invalid under the Sherman Law—unless, that is, we are to depart from the respect we have accorded authoritative legislative history in scores of cases during the last decade. See cases collected in *Commissioner* v. *Estate of Church,* 335 U. S. 632, 687, Appendix A. In many of these cases the purpose of Congress was far less clearly revealed than here.[2] It has never been questioned

---

[1] The Senate Report on the District of Columbia Revenue Bill, S. Rep. No. 879, 75th Cong., 1st Sess., quoted S. Rep. No. 2053, 74th Cong., 2d Sess. See S. Rep. No. 257, 75th Cong., 1st Sess., which also quotes the text of the earlier report.

[2] The intricate verbal arguments used to support the Court's decision do not affect the clarity of the statute and its legislative history. (1) It is said that the proviso to the Miller-Tydings Amendment makes it inapplicable to "non-signer" clauses in State acts. But the proviso only made explicit that the Amendment applied only to vertical agreements and did not make legal horizontal agree-

in this Court that committee reports, as well as statements by those in charge of a bill or of a report, are authoritative elucidations of the scope of a measure.

It is suggested that we go to the words of the sponsors of the Miller-Tydings Amendment. We have done so. Their words confirm the plain meaning of the words of the statute and of the congressional reports. Senator Tydings made the following statement: "What we have attempted to do is what 42 States have already written on their statute books. It is simply to back up those acts, that is all; to have a code of fair trade practices written not by a national board such as the N. R. A. but by each State, so that the people may go to the State

ments, for example, those between retailers or between manufacturers. See statements of Senator Tydings, 81 Cong. Rec. 7487, 7496. The wording of the proviso, in fact, follows closely a statement of what the Senate Committee thought was implicit in the State acts. See S. Rep. No. 2053, 74th Cong., 2d Sess. 2. (2) The fact that the 1931 California statute used wording similar to the Miller-Tydings Amendment and was later amended to refer to nonsigners is beside the mark. The words of the 1933 amendment to the California statute make clear that it was not, like the Miller-Tydings Amendment, designed to remove the bar of an antitrust act. It was enacted to give an affirmative right to recover from nonsigners, something the Miller-Tydings Amendment does not purport to do. In such a statute specific language referring to nonsigners would of course have to be used. (3) It is said that H. R. Rep. No. 382, 75th Cong., 1st Sess., refers to a bill containing the phrase "other conditions." The words "other conditions," when used in conjunction with a phrase referring to minimum prices, could scarcely mean anything except "conditions other than minimum prices." We are here concerned with minimum prices. (4) "Permissive" was used in the Senate Report not to refer to retailers but to manufacturers. "[The State acts] merely authorize a manufacturer or producer to enter into contracts for the maintenance of his price, but they do not compel him to do so. In other words, they are merely permissive." S. Rep. No. 2053, 74th Cong., 2d Sess. 2.

legislature and correct immediately any abuses that may develop." 81 Cong. Rec. 7496.

Representative Dirksen made a statement to the House as a member of its Conference Committee. He referred to the case of *Old Dearborn Co.* v. *Seagram Corp.*, 299 U. S. 183, in which this Court had held that the "non-signer" provision of the Illinois "fair trade" statute did not violate the Due Process Clause. Mr. Dirksen continued: "A question then arose as to whether or not the maintenance of such resale prices under a State fair trade act might not be in violation of the Sherman Anti-Trust Law of 1890 insofar as these transactions sprang from a contract in interstate commerce. This question was presented to the House Judiciary Committee and there determined by the reporting of the Miller bill. It was essentially nothing more than an enabling act which placed the stamp of approval upon price maintenance transactions under State acts, notwithstanding the Sherman Act of 1890." 81 Cong. Rec. 8138.

Every one of the 42 State acts which the Miller-Tydings Amendment was to "back up"—the acts on which the Miller-Tydings Amendment was to place a "stamp of approval"—contained a "non-signer" provision. As demonstrated by experience in California, the State acts would have been futile without the "non-signer" clause. The Court now holds that the Miller-Tydings Amendment does not cover these "non-signer" provisions. Not only is the view of the Court contrary to the words of the statute and to the legislative history. It is also in conflict with the interpretation given the Miller-Tydings Amendment by the Federal Trade Commission,[3] by the Depart-

---

[3] See letter addressed to the President by the Chairman of the Federal Trade Commission, S. Doc. No. 58, 75th Cong., 1st Sess., pp. 2–3. See also Report of the Federal Trade Commission on Resale Price Maintenance LXII (Dec. 13, 1945).

ment of Justice,[4] and by practically all persons adversely affected by the "fair trade" laws.[5] The "fair trade" laws may well be unsound as a matter of economics. Perhaps Congress should not pass an important measure dealing with an extraneous subject as a rider to a revenue bill, with the coercive influence it exerts in avoiding a veto; perhaps it should restrict legislation to a single relevant subject, as required by the constitutions of three-fourths of the States. These are matters beyond the Court's concern. Where both the words of a statute and its legislative history clearly indicate the purpose of Congress, it should be respected. We should not substitute our own notion of what Congress should have done.

APPENDIX TO OPINION OF MR. JUSTICE FRANKFURTER.

HOUSE REPORT No. 382, 75TH CONG., 1ST SESS.

The Committee on the Judiciary, to whom was referred the bill (H. R. 1611) to amend the act entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890, after consideration, report the same favorably to the House with an amendment with the recommendation that as amended the bill do pass.

---

[4] The Department of Justice appears to have instituted no prosecutions because of enforcement of "fair trade" acts against nonsigners. The Assistant Attorney General who played an important part in enforcement of the antitrust laws called for repeal of the Miller-Tydings Amendment because it made legal the nonsigner provisions of the State "fair trade" acts. Statement of Mr. Thurman Arnold, T. N. E. C. Hearings, pp. 18162–18165.

[5] The contention that the "non-signer" provisions are not within the Miller-Tydings Amendment appears to have been made in only two reported cases since the Amendment was passed in 1937. *Calamia* v. *Goldsmith Bros., Inc.,* 299 N. Y. 636 and 795, 87 N. E. 2d 50 and 687; *Pepsodent Co.* v. *Krauss Co.,* 56 F. Supp. 922. In both, the argument was rejected.

The committee amendment is as follows: Strike out all after the enacting clause and insert in lieu thereof the following:

That section 1 of the Act entitled "An Act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890 (U. S. Code, title 15, sec. 1), be amended to read as follows:

"SECTION 1. Every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court. Nothing herein contained shall render illegal, contracts or agreements prescribing minimum prices or other conditions for the resale of a commodity which bears, or the label or container of which bears, the trade mark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class produced or distributed by others, when such contracts or agreements are lawful as applied to intrastate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 5, as amended and supplemented, of the Act entitled 'An Act to create a Federal Trade Commission, to

define its powers and duties, and for other purposes,' approved September 26, 1914 (U. S. Code, title 15, sec. 45)."

GENERAL STATEMENT

The sole objective of this proposed legislation is to permit the public policy of States having "fair trade acts" to operate with respect to interstate contracts for the resale of goods within those States. The fair-trade acts referred to legalize the maintenance, by contract, of resale prices of branded or trade-marked goods which are in free competition with other goods of the same general class.

To accomplish this end, the reported bill amends section 1 of the Sherman Antitrust Act which declares every contract in restraint of trade illegal. The amendment adds a sentence to the section, in the nature of a limitation, to the effect, in substance, that nothing therein contained shall render illegal contracts prescribing minimum prices or other conditions for resale of branded or trade-marked goods when such contracts are lawful as to intrastate transactions under the State law of the State in which the resale is to be made; and that the making of such contracts shall not be an unfair method of competition under section 5 of the Federal Trade Commission Act.

In view of the decision of the Supreme Court in *Dr. Miles Medical Co.* v. *Park & Sons Co.* (220 U. S. 373), and other cases, it is doubtful, at least, that such contracts are now valid in interstate commerce.

STATE FAIR TRADE ACTS

State fair trade acts typically provide, first, that contracts may lawfully be made which provide for maintenance by contract of resale prices of branded or trade-marked competitive goods. Second, that third parties

with notice are bound by the terms of such a contract regardless of whether they are parties to it.

The pertinent provisions of the Illinois act, recently held constitutional by the Supreme Court in the case of *Old Dearborn Distributing Co.* v. *Seagram-Distillers Corporation* (decided Dec. 7, 1936) read as follows:

SECTION 1. No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, the trade mark, brand, or name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of the State of Illinois by reason of any of the following provisions which may be contained in such contract:

(1) That the buyer will not resell such commodity except at the price stipulated by the vendor.

(2) That the producer or vendee of a commodity require upon the sale of such commodity to another that such purchaser agree that he will not, in turn, resell except at the price stipulated by such producer or vendee.

Such provisions in any contract shall be deemed to contain or imply conditions that such commodity may be resold without reference to such agreement in the following cases:

(1) In closing out the owner's stock for the purpose of discontinuing delivery of any such commodity: *Provided, however,* That such stock is first offered to the manufacturer of such stock at the original invoice price, at least ten (10) days before such stock shall be offered for sale to the public.

(2) When the goods are damaged or deteriorated in quality, and notice is given to the public thereof.

(3) By any officer acting under the orders of any court.

SEC. 2. Wilfully and knowingly advertising, offering for sale, or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 1 of this Act, whether the person so advertising, offering for sale, or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby.

The following States, the committee is advised, have adopted fair trade acts: California, Washington, Oregon, Montana, Wyoming, Arizona, New Mexico, Utah, North Dakota, South Dakota, Kansas, Louisiana, Arkansas, Iowa, Wisconsin, Illinois, Kentucky, Tennessee, Indiana, Ohio, Georgia, Virginia, West Virginia, Pennsylvania, Maryland, New York, New Jersey, and Rhode Island.

The committee is advised that in addition one house of each of the following States have passed a fair trade bill: South Carolina, North Carolina, Idaho, Colorado, and Oklahoma.

The committee is further advised that bills are pending in the Legislatures of Nevada, Michigan, Minnesota, Texas, Mississippi, Delaware, Missouri, Connecticut, Massachusetts, New Hampshire, and Maine; and that only one State, Vermont, has definitely rejected legislation of this character.

## ECONOMIC ASPECTS

The anticipated economic effects of the legislation here proposed were presented both by proponents and opponents of the bill in the hearings held by the subcommittee of the Committee on the Judiciary in charge of the bill. On the one hand it is urged that predatory price cutting is a weapon of monopolistic large distributors to crush small businessmen. On the other hand, it is contended that price-maintenance legislation tends unduly to enhance

the price of goods to the consumer. To this argument it is answered that the free play of competition between products of different manufacturers of the same general class will prevent such a result.

However, in the opinion of the committee, those arguments are more properly addressed to the State legislatures considering the enactment of fair trade acts. It is the legislature's responsibility to fix the public policy of the State. This legislation merely seeks to help effectuate a public policy so fixed in a State. It has no application to any State which does not see fit to enact a fair trade act.

In this connection the committee invites attention to the following paragraph of the opinion of the Supreme Court, heretofore referred to, upholding the constitutionality of the Illinois act, the Court speaking through Mr. Justice Sutherland:

> There is a great body of fact and opinion tending to show that price cutting by retail dealers is not only injurious to the goodwill and business of the producer and distributor of identified goods, but injurious to the general public as well. The evidence to that effect is voluminous; but it would serve no useful purpose to review the evidence or to enlarge further upon the subject. True, there is evidence, opinion, and argument to the contrary; but it does not concern us to determine where the weight lies. We need say no more than that the question may be regarded as fairly open to differences of opinion. The legislation here in question proceeds upon the former and not the latter view; and the legislative determination in that respect, in the circumstances here disclosed, is conclusive so far as this court is concerned. Where the question of what the facts establish is a fairly debatable one we accept and

carry into effect the opinion of the legislature. *Radice* v. *New York* (264 U. S. 292, 294); *Zahn* v. *Board of Public Works* (274 U. S. 325, 328, and cases cited).

### EFFECTUATION OF STATE PUBLIC POLICY

Your committee respectfully submit that sound public policy on the part of the Federal Government lies in the direction of lending assistance to the States to effectuate their own public policy with regard to their internal affairs. It is submitted that this is especially true where such assistance, as in this instance, consists of removing a handicap resulting from the surrender of the power over interstate commerce by the States to the Federal Government.

. . . . .

### SENATE REPORT No. 2053, 74TH CONG., 2D SESS.

The Committee on the Judiciary, having had under consideration the bill (S. 3822) to amend the act entitled "An act to protect trade and commerce against unlawful restraints and monopolies," approved July 2, 1890, report the same back with the recommendation that the bill do pass.

In 1933 a law was enacted by the State of California authorizing a manufacturer or producer of a commodity which bears his trade mark, brand, or name, and which is sold in free and open competition with commodities of the same general class produced by others, to make a contract that the purchaser will not resell such commodity except at the price stipulated by the manufacturer or producer.

The purpose of the California act, as expressed in its title, was to protect trade-mark owners, distributors, and the general public against injurious and uneconomic prac-

tices in the distribution of articles of standard quality under a trade mark, brand, or name, and the particular practice against which it was directed was the so-called "loss-leader selling."

Since the passage of the California act similar legislation has been enacted in 12 other States, namely, New York, Illinois, Pennsylvania, New Jersey, Oregon, Washington, Wisconsin, Iowa, Maryland, Ohio, Virginia, and Rhode Island (the last three since the introduction of the proposed bill).

In still other States contracts stipulating minimum resale prices are valid at common law.

In the States where such contracts are lawful it has been found that loss-leader selling of identified merchandise sold under competitive conditions operates as a fraud on the consumer destroys the producer's goodwill in his trade mark, and is used by the large merchant to eliminate his small independent competitor.

In recommending the passage of S. 3822 the committee, while fully recognizing the evils of loss-leader selling, is not required to determine the effectiveness of the device adopted by the States to eliminate the same.

It is sufficient that this type of selling unquestionably has had a disastrous effect upon the small independent retailer, thereby tending to create monopoly, and that a large number of States have found that its evil effects can be mitigated, if not eliminated, by legalizing contracts stipulating minimum resale prices.

The Congress is not called upon to pass upon the effectiveness of the remedy, but it should not put obstacles in the way of efforts of the individual States to make the remedy effective.

Though there is no specific adjudication on the subject, it is believed that contracts stipulating minimum resale prices, even when they are made or are to be performed

in a State where such contracts are lawful, may violate the Sherman Act whenever the goods sold under the contract move in interstate commerce.

Consequently, many manufacturers not domiciled in the state of the vendee are unwilling to run the risk of violating the Federal law, and the effectiveness of the State fair-trade laws is thereby seriously impaired.

S. 3822 removes the doubt as to the applicability of the Sherman Act by expressly legalizing such contracts where legal under the laws of the State where made or where they are to be performed.

Moreover, the proposed bill declares such contracts shall not be an unfair method of competition under the Federal Trade Commission law.

The language of the bill, in describing the class of commodities to which it is applicable, follows closely the language of the State acts, and the scope of the bill is therefore carefully limited to commodities "in free and open competition with commodities of the same general class produced by others."

The State acts are in no sense general price-fixing acts. They merely authorize a manufacturer or producer to enter into contracts for the maintenance of his price, but they do not compel him to do so. In other words, they are merely permissive.

They do not authorize horizontal contracts, that is to say, contracts or agreements between manufacturers, between producers, or between wholesalers, or between retailers as to the sale or resale price of any commodity.

They apply only to commodities which are in free and open competition with commodities of the same general class produced by others, and they therefore do not in any sense restrain trade or competition. In fact, they legalize a device which is intended to increase competition and prevent monopoly.

But most important, from the standpoint of the Congress, the proposed bill merely permits the individual States to function, without Federal restraint, within their proper sphere, and does not commit the Congress to a national policy on the subject matter of the State laws.

In other words, the bill does no more than to remove Federal obstacles to the enforcement of contracts which the States themselves have declared lawful.