**UNITED STATES v. CANADIAN AMERI-
CAN CO., Inc., et al.**

**Civ. No. 11283.**

United States District Court
E. D. New York.

Aug. 13, 1951.

Joseph Jaspan, Brooklyn, N. Y., for receiver.

Robert Lee Henry and McGuigan & Kilcullen, New York City, for defendants, James A. Wigmore and Pearl Johnstone Wigmore.

Lester S. Jayson, Silver Springs, Md., for Joel Jayson, purchaser.

ABRUZZO, District Judge.

A receiver was appointed by an order of this Court dated December 5, 1950, pursuant to Section 3678(d) of Title 26 U.S.C.A., to take over the assets and credits of one James Albert Wigmore and others. The attorney for the defendants (James Albert Wigmore and his wife, Pearl Johnstone Wigmore), Robert Lee Henry, consented to this appointment.

Mr. Wigmore was the owner of property in Old Westbury, Long Island, consisting of acreage and houses thereon. On March 15, 1951, an order was made and entered directing that a hearing be held to consider the offer of one Joel Jayson to pay $86,000 for this property. An order was made directing a hearing to consider this offer, and the hearing was set for April 25, 1951. The order also directed that any bids in excess of $86,000 would be considered on that date. The fact that this property was to be sold and bids to be received in Court on April 25th was properly advertised in the Nassau Daily Review Star and the New York Times on March 26, 1951, and April 23, 1951. It was further advertised on April 2, 9, and 16, 1951, in the Nassau Daily Review Star. In Court on the morning of April 25, 1951, the property was offered for sale in open court. After several bids were received, Mrs. Wigmore made the highest bid of $116,000. Mr. Wigmore was present in Court during the bidding. The terms of sale which were advertised and read in open court before the bidding was opened provided that 10 per cent of the purchase price be paid by the highest bidder to the receiver in cash or certified check. It developed that Mrs. Wigmore did not have the required cash or certified check representing 10 per cent of the purchase price, and Mrs. Wigmore was informed that the Court could not accept her bid because of her failure to comply with the terms of sale. She requested a ten-minute adjournment which was granted. Thereafter she requested through her counsel an adjourn-

ment of sale until 3 o'clock so that she could comply with the terms of sale and obtain the necessary 10 per cent of her bid, she being short at that time some $7,000 or $8,000. At 3 o'clock the attorney stated that his client had telephoned him that she had the money but was held up in traffic and needed a little more time to reach Court. After some colloquy with counsel, the Court asked Mr. Henry where Mrs. Wigmore was at the time he stated that she would be in Court in a few minutes. His answer was that at 3 o'clock she was leaving Westbury, Long Island. At 3:30 p. m. the property again was offered for sale *de novo* and sold to the highest bidder, Joel Jayson, for the sum of $116,500, and the proceedings were closed at 3:40 p. m.

The Court was compelled to proceed with the sale due to the fact that it was obvious that had the sale been delayed any longer it was possible there would have been no other bidders in Court except Mrs. Wigmore.

On the morning of the sale, Mr. Henry made a motion before the Court to stay the sale indefinitely on the ground that the Court did not have power to order a sale of this property until it was adjudicated that Mr. Wigmore owed the Government the taxes claimed by it to be due. This was the first intimation throughout the proceedings that the jurisdiction of the Court to sell the property was being questioned. Had Mrs. Wigmore been the successful bidder the question of jurisdiction would never have arisen. She knew it was impossible for her to comply with the terms of sale as the lowest bid was $86,000 and she did not have $8,600 as an initial deposit. It is my firm opinion that she attempted to sabotage the sale.

The Court decided to hold a hearing on June 7, 1951, with respect to questions pertaining to the sale and would have ordered a resale if the Wigmores would have guaranteed to protect the Government against any loss that it might sustain as a result of a resale. The Court felt that it had inherent power to do so. Jayson might have some claim and the Government had expended in excess of $2,000 for an appraisal by a real estate expert, affidavits, and advertisements in the newspapers.

The proceeding reeks with bad faith on the part of the Wigmores in spite of the fact that the Court has been very patient in its endeavor to give them every opportunity to do something for themselves. The proceedings indicate that Mr. Wigmore had failed to pay real estate taxes for several years and the County of Nassau was ready to foreclose a tax lien on this property. The receiver was compelled to pay these taxes in order to forestall the sale. In addition, a judgment had been obtained against Mr. Wigmore in the State Court for $26,-000 and the sheriff of Nassau County was about to sell the property under a writ of execution when the sale was stayed by the Court. If the sale had not been stayed, Mr. Wigmore would have lost the property. This all happened prior to the sale of April 25th.

Another indication of the bad faith of Wigmore in his present attempt to advance the theory that the Court did not have jurisdiction to sell until an adjudication was had is proved by the following colloquy (S. M. 149):

"Mr. McGuigan: Well, if no surety company will give us the bond, we will have the money.

"The Court: Let them put it up in cash if they wish to. I will take $50,000 in cash or in a surety bond.

"All right, gentlemen. This is put over until Monday."

On Monday, Mr. McGuigan said he was not able to put up any bond. It was adjourned one day more to see if Mrs. Wigmore could obtain the cash and at that time Mr. McGuigan told the Court that neither a bond nor the cash could be obtained. (Mr. McGuigan is a member of the firm that had succeeded Robert Lee Henry as attorney for the Wigmores.)

We now come to the Wigmores' contention that the Court did not have the power to order a sale of this property before an adjudication. In support of this contention that there must be an adjudication, the Wigmores cite Schwegmann Bros. v. Calvert

Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, and United States v. Obermeier, 2 Cir., 186 F.2d 243, 255, note 57, as authorities. These cases are not in point as they do not fit the facts which are presented here. The receiver was appointed properly. The Commissioner of Internal Revenue, pursuant to Sections 273 and 3660 of Title 26 U.S.C.A., had levied jeopardy assessments against Mr. Wigmore, properly and legally, amounting to $830,680.66. The jeopardy assessments could have been stayed either by depositing the money with the Government subject to exceptions as to its propriety or a bond could have been filed pursuant to Sections 273 and 3660. Neither was done by this defendant.

An income tax assessment has the effect of a judgment, and this is not novel. The Supreme Court so ruled in Bull v. United States, 295 U.S. 247, 55 S.Ct. 695, 79 L.Ed. 1421 and similarly Citizens Nat. Trust & Savings Bank of Los Angeles v. United States, 9 Cir., 135 F.2d 527.

In United States v. City of Greenville, 4 Cir., 118 F.2d 963, the court said at page 965: "When properly perfected, the lien under the statute constitutes a charge upon specific property of the taxpayer for the satisfaction of which that property may be sold under proceedings instituted for the purpose. * * *"

The Federal statutes create specific liens for taxes and as a corollary give a specific remedy for their removal and when such liens once attach, they may be lifted only as provided by statute, Metropolitan Life Ins. Co. v. United States, 6 Cir., 107 F.2d 311, 313, to wit, in this case by either paying the jeopardy assessment or bonding it.

The defendants, Mr. and Mrs. Wigmore, knew of this sale, consented to the appointment of the receiver, and apparently objected to the consummation on the morning of April 25th only when they found that Mrs. Wigmore did not have sufficient money to make a proper bid. Throughout the period of time that the property was offered for sale with their knowledge, they gave no intimation of any objection. They permitted the Government to spend, as I have stated, upwards of $2,000 to make the sale possible. If ever the doctrine of waiver or estoppel should be invoked, the instant case is clearly one that is covered by the doctrine. Taking a broad view of the result of this sale, the money takes the place of the property. Mr. Wigmore has lost nothing, for admittedly the bid is a very good one. The receiver cannot disburse this money except by order of Court. There can be no final disbursement of funds until there is a final adjudication. If one were to analyze the sheer equities of this case, it seems to me that there must be a ruling that the sale was properly held.

The decisions indicate plainly that the Court has power to order this sale. Mellen v. Moline Malleable Iron Works, 131 U.S. 352, 9 S.Ct. 781, 33 L.Ed. 178, and Broadway Trust Co. v. Dill, 3 Cir., 17 F.2d 486, hold that in receivership proceedings a Federal Court under general equity authority has power and jurisdiction to order a public sale of real estate. In the Mellen case, the Court held 131 U.S. at pages 369–370, 9 S.Ct. at page 787, 33 L.Ed. 178: "A large part of the argument on behalf of the appellants is in support of the proposition that, as the order requiring Hill to appear and plead, answer or demur, to the original and supplemental bills was not made until after the receiver had, by order of the court, sold the property, the sale was a nullity. We do not assent to this view. Whether the condition of the property was such as to require, for the protection of the parties, that it be sold, was a matter for the court, in its discretion, to determine. There is nothing to show that the order of sale was even improvidently made, much less that it was procured by fraud, or that the property was sacrificed. If the circumstances justified immediate action, the court had power to order a sale in advance of a final decree. The sale was not ordered or made until after Hill had been duly served with a copy of the order of November 28, 1883, to appear and plead, answer or demur, to the cross-bill by the day fixed in that order. If the sale was irregular, by reason of its being ordered and made before Hill was directed to appear and plead, answer or demur, to the original and supplemental bills, that is not a matter affect-

ing the jurisdiction of the court to render a final decree in respect to his interest in the property; for the proceeds took the place of the property, and whatever rights Hill had in the latter were transferred to the former."

In United States v. Morris & Essex R. Co., 2 Cir., 135 F.2d 711, it was held at page 713: "In the first place the tax is not like an ordinary claim; the plaintiff need not wait for judgment in order to levy execution; it can distrain ten days after notice and demand. § 3690, Title 26 U.S.C.A. Int.Rev.Code. And if it can distrain and sell without any judgment, not only the lessor's chattels, but this very chose in action, the assessment is itself the equivalent of a judgment for purposes of collection."

The assessments in the instant case are, therefore, the equivalent of a judgment and may be lifted only as provided by Sections 273 and 3660. The property can be sold prior to final adjudication.

The objections are overruled.