On Application for Rehearing
In an application for rehearing counsel i for respondents (Schwegmann Brothers)justifiably complain that we failed to comprehend and therefore did not discuss one of their most seriously argued contentions,, i. e., that when our State Supreme Court, in Pepsodent Co. v. Krauss Co., 200 La. 959, 9 So.2d 303, upheld the constitutionality of our Fair Trade laws there was-not presented to it and therefore not considered or discussed by it the contention that such Fair Trade laws constitute an. unconstitutional delegation of legislative authority and are therefore violative of’ *509 section 1, Article 3 of our State Constitution, LSA-Const.
Counsel direct attention to a well recognized principle to which our Supreme Court referred when, in City of Alexandria v. Alexandria Fire Fighters Ass’n, 220 La. 754, 57 So.2d 673, 674, it said:
“It is an elementary principle of constitutional law that legislative power, conferred under constitutional provisions, cannot be delegated by the Legislature either to the people or to any other body or authority. State v. Watkins, 176 La. 837, 147 So. 8, citing Cooley’s Constitutional Limitations, 8th Ed. Vol. 1, pp. 224, 238, 239, 240, 242, 244; 16 C.J.S., Constitutional Law, § 133; 11 Am.Jur. Sec. 214.”
Counsel then say that the application of this principal to the power to fix prices requires a holding that such “price fixing” legislation constitutes an unconstitutional delegation of legislative authority.
In support of their contention that the practice which is authorized by Fair Trade legislation is unconstitutional price fixing counsel direct our attention to Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035, in which the Supreme Court of the United States held that the Miller-Tydings Amendment to the Sherman Act did not authorize “price fixing” in Louisiana to the extent that a distributor or a manufacturer might prevent a non-signer from selling a trade-marked article at a price below the minimum or above the maximum price fixed in a contract with some other retailer.
Counsel insist that, as a result of this decision, it is now established that such a practice as is contended for by the Tichenor Antiseptic Company is “price fixing” and that “price fixing” is per se a legislative function and that therefore the authority to fix prices cannot be delegated to a manufactarer or a retailer, whether the article bears a trade name or a trade mark or not.
We have concluded not to enter into a lengthy discussion concerning whether such legislation is or is not wise or economically sound. Much can be said and has been said on each side of this question. There can be no doubt that such a state statute, if not unconstitutional, permits the manufacturer of a trade-marked article to require that no such article shall be sold below the minimum nor above the maximum price fixed by the said manufacturer or distributor, and that such prices, if fixed in a contract with one retailer, will bind all retailers and that, to that extent, such a practice constitutes the fixing of prices on that article.
However, although the Supreme Court of the United States, in Schwegmann Bros. v. Calvert Distillers Corp., supra, did characterize such legislation as “price fixing”, it does not necessarily follow that our State Supreme Court would hold that it is an unconstitutional delegation of legislative authority to permit such price fixing. We adhere to the view that there is a vast distinction between the fixing of a price on a staple, such as sugar or rice or salt, and the fixing of a price on a trade-marked brand of such a staple, such as Morton Salt or Godchaux’s Sugar or Mahatma Rice.
Where a manufacturer, by his industry and skill or technical learning, has produced an article which is superior to other competing articles and, by his extensive advertising, has created an extraordinary demand for that article, we see nothing improper in permitting him to determine that if. that article is sold below a certain price, the retailers who sell it will not be interested in pushing it and will make efforts to have the purchasing public buy competing articles on which the said retailers will make a larger profit. The retailers are not compelled to buy such articles and, if the manufacturer establishes a minimum price so high that the public will not purchase it, the manufacturer, more than anyone else, will be the sufferer.
During the oral argument our attention' was directed to what counsel referred to *510 as the Ingersoll Watch Company failure. We’have not before us the facts to which counsel referred, but we can readily see that the results which were pictured as having occurred in that case might well occur in any case in which a manufacturer, who had established a tremendous demand for his trade-marked article, might permit it to be sold at a price which would destroy the interest of the retailers in selling it.
We are told that in the Ingersoll case the Ingersoll Company, which had established an overwhelming demand for the dollar watch, took the position that any retailer might sell its watches at any price fixed by the retailer and that, as a result, the prices were fixed so low by some retailers that others, making practically no profit, commenced to “push” other watches as being better than the Ingersoll so that they might make a more substantial profit, and we are told too that, as a result of this, in a very few years, the Ingersoll Company, which had been tremendously profitable, was forced into bankruptcy. This may not be the actual story of the Ingersoll watch, but it might well be the story of any trademarked article if the minimum price is not permitted to be protected by the manufacturer.
So far as one of the purposes of the legislation is concerned, we see little distinction between the Fair Trade law and the so-called Loss Leader Law (Unfair Sale Law) LSA-R.S. 51:422. It is true that the Loss Leader Law was primarily passed for the purpose of protecting the public against the practice of some retailers of selling goods at less than cost in order that the public might be attracted into the establishments and then charge exorbitant prices for other articles. But surely the Loss Leader Law also afforded protection to the manufacturers of such well known articles.
In considering the constitutionality of the Loss Leader Law our State Supreme Court, in Louisiana Wholesale Distributors Ass’n, Inc. v. Rosenzweig, 214 La. 1, 36 So.2d 403, 406, quoted from Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 516, 78 L.Ed. 940, 89 A.L.R. 1469, as follows:
“ ‘ * * * And it is equally clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power. * * * The constitution does not secure to anyone liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty.’ ”
Our conclusion on this issue is that to permit the manufacturer of such an article as is involved here to fix a minimum price does not constitute unconstitutional delegation of legislative authority.
Counsel also complain that such legislation constitutes a deprivation of due process guaranteed by the Constitution. This might be true if there were no reasonably substantial relationship between such price fixing and the public welfare. But, for the reasons we have already given, we believe that the public welfare is involved in the continuance in the manufacturing *511 business of manufacturers who have established demands for such articles, and that therefore there is no violation of constitutional due process in enforcement of such legislation.
Nor do we think that the means adopted for the carrying out of the purpose are unrelated to the purpose sought to be served by the statute. The manufacturer, better than anyone else, knows at what price his goods must be sold if the interest of the public is to be maintained and if the interest of the retailer in selling the goods is also to be maintained.
For these reasons we conclude that there is no deprivation of due process in the enforcement of such legislation.
The rehearing requested is denied, but the right is reserved to each party to make further application for rehearing.
, . _ , . . Application for Rehearing refused.