Honorable Thomas M. Durkin, United States District Judge
Alarm Detections Systems, Inc. is a company that provides fire alarm services to commercial and multi-unit residential buildings. It alleges that the Orland Fire Protection District ("Orland FPD") and Tyco Integrated Security, LLC have conspired to restrain or monopolize trade in the market for fire alarm system monitoring in violation of the Sherman and Clayton Acts and the Equal Protection and Due Process Clauses of the Fourteenth Amendments. The case proceeded to a bench trial on May 22, 2017, and the Court received evidence through May 26, 2017. Initial post-trial briefing was completed on June 26, 2017, and the Court heard closing arguments on August 10, 2017. The parties submitted supplemental post-trial briefs on June 7, 2018, at the Court's request.
This opinion sets forth the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). These findings are based on the documentary evidence and trial testimony. They are also based on the Court's credibility determinations after observing the witnesses testify. This opinion also addresses Alarm Detection's motion to reconsider the Court's earlier dismissal of part of the Fourteenth Amendment claims. R. 488. For the following reasons, the Court finds in favor of Orland FPD and Tyco on the merits and will enter judgment against Alarm Detection.
Findings of Fact
Companies like Alarm Detection and Tyco install fire alarms (meaning the fire sensors and the transmitters that send alarm signals) in commercial and multi-unit residential buildings, and then monitor the transmitted signals for indications of fire or a need for maintenance of the alarms. Various technological systems can be used to monitor fire alarm signals. The systems relevant to this case are (1) central station and (2) direct connect. In a central station system, an alarm company establishes one facility to receive alarm signals indicating the presence of fire from multiple governmental jurisdictions and then relays those signals to the relevant jurisdiction's fire department 911 dispatch center. In a direct connect system, fire alarm transmitters send alarm signals directly to the relevant 911 dispatch center, without passing through a central station.
Some jurisdictions accommodate both direct connect and central station fire alarm *608 monitoring. At issue in this case, however, are jurisdictions that have enacted ordinances requiring buildings to send fire alarm signals directly to the jurisdiction's 911 dispatch center. The Illinois appellate court has held that Illinois municipalities have statutory authority to mandate a direct connect fire alarm monitoring system. See Alarm Detection Sys., Inc. v. Village of Hinsdale , 326 Ill.App.3d 372, 260 Ill.Dec. 599, 761 N.E.2d 782, 785 (2d Dist. 2001). Similarly, the Seventh Circuit has held that Illinois fire protection districts have statutory authority to mandate direct connect systems. See ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Protection Dist. , 672 F.3d 492, 501-02 (7th Cir. 2012).
Fire protection districts are governmental entities created pursuant to the Illinois Fire Protection District Act, 70 ILCS 705, to "allow two or more local governments to consolidate fire protection and related services." Lisle-Woodridge , 672 F.3d at 495. A fire protection district is administered by an elected board of trustees. "The Board of Trustees of any fire protection district ... may contract with any corporation organized to furnish fire protection service." 70 ILCS 705/11a. The jurisdictional entities relevant to this case are Defendant Orland FPD and non-parties the Village of Orland Hills and the Village of Orland Park. The Villages of Orland Park and Orland Hills together constitute more than 98% of the geographic territory comprised by Orland FPD. See R. 501 at 1 n.1 (citing R. 472 at 278 (635:18-25) ).
A governmental entity desiring to implement a "direct connect" system for receipt of fire alarm signals at its 911 dispatch center generally hires an alarm company to provide reception equipment, and sometimes staff, at the 911 dispatch center. Fire alarm companies must obtain a license from the FCC to use a certain signal frequency. See R. 472 at 345 (702:7-13). An alarm company's transmission and reception equipment will be calibrated to the frequency the alarm company has licensed. Thus, when a governmental entity hires an alarm company to establish a 911 dispatch center for a direct connect system, the alarm company must also provide the fire alarm transmitters to the commercial buildings, or sub-license other alarm companies to transmit on that frequency.
Fire alarm transmitters and receivers are generally built to transmit or receive only one signal frequency. See R. 475 at 147 (1363:12-21).[1] And in a direct connect system, the governmental entity requires that the signal transmit directly from the fire alarm to 911 dispatch. Thus, even if the other alarm companies not hired to provide the equipment for the 911 dispatch center are interested in reaching an agreement to use the transmission frequency of the company maintaining the 911 dispatch *609 center, those companies do not have access to, and cannot monitor, the signals sent by the alarm transmitters, whether indicating the presence of fire in the building or that the alarm transmitters and sensors require maintenance. See R. 471 at 93 (93:2-8); R. 475 at 146-47 (1362:22-1363:4).
In 2006, Orland FPD adopted an ordinance requiring direct connection to its 911 dispatch center. See Ex. D-140. Orland FPD witnesses testified that they believe that direct connect is safer and more efficient. R. 472 at 218-19 (575:15-576:19); 230 (587:3-24); 253-54 (610:4-611:15).[2] As far back as 1991, Orland FPD hired Tyco's corporate predecessors to provide alarm monitoring services and equipment for Orland FPD's 911 dispatch center and commercial buildings in Orland FPD. See R. 472 at 250-52 (607:17-609:2).
In 2012 and 2013, the Seventh Circuit issued decisions questioning the authority of fire protection districts to engage in the business of fire alarm monitoring and transmission in a case against the Lisle-Woodridge Fire Protection District. See Lisle-Woodridge , 672 F.3d at 492 ; ADT Sec. Servs., Inc. v. Lisle-Woodridge Fire Protection Dist. , 724 F.3d 854 (7th Cir. 2013). Unlike the defendant Lisle-Woodridge FPD, however, Orland FPD never directly sold or leased alarm transmitters to customers. Nevertheless, apparently in light of the Lisle-Woodridge decisions, and at the suggestion of Tyco, Orland FPD rescinded the direct connect requirement provision of its ordinance. See Ex. D-115. But because Orland FPD officials continued to prefer direct connect fire alarm monitoring to central station monitoring, they lobbied the Villages to enact ordinances mandating a direct connect system for fire alarms in the Villages. See R. 427 at 215-16 (572:14-573:5). Those new ordinances required that Orland FPD's 911 dispatch center be the direct connection reception facility. See Ex. D-143; P-053. Orland FPD also renewed its exclusive agreement with Tyco in 2014. See Ex. J-006.
Alarm Detection alleges that this arrangement between Orland FPD and Tyco illegally precludes Alarm Detection from competing in the fire alarm monitoring business in Orland FPD. See Lisle-Woodridge , 724 F.3d at 865 (expressing in dicta "serious concerns about the anti-competitive effects" of a direct connect system).[3] Indeed, Tyco provides the transmitters for, and monitors the fire alarm signals from, nearly 100 percent of the customers in Orland FPD. See R. 475 at 23 (1239:10-13). Although this arrangement does not directly preclude Alarm Detection from installing and maintaining alarm transmitters, Alarm Detection must purchase the alarms it installs in Orland FPD from Tyco for $1580, see R. 472 at 342-43 (699:20-700:3), or the transceiver component of the transmitter for $200, see R. 472 at 346-47 (703:15-704:3); R. 473 at 23 (729:3-7), and then contract with Tyco to send signals directly to the Orland FPD 911 dispatch center. As discussed, this means that even if Alarm Detection buys transmitters from *610 Tyco and contracts with Tyco for monitoring at the Orland FPD 911 dispatch (as is required by ordinance), Alarm Detection cannot receive maintenance signals directly from the alarms, but is reliant on Tyco or Orland FPD to forward those signals to Alarm Detection. Alarm Detection argues that the cost of buying alarm transmitters from Tyco, and its inability to directly monitor alarm signals, means that its services cannot be competitive in Orland FPD, and that it and other alarm companies are effectively precluded from competing for the business of monitoring fire alarms in individual commercial buildings within the Orland FPD.
Alarm Detection also alleges that Tyco's effective monopoly over fire alarm monitoring in Orland FPD causes customers there to pay more for fire alarm monitoring services. Tyco charges $89 to customers in Orland FPD, see R. 472 at 102 (459:10-14), with $23.50 of that fee being remitted to Orland FPD for the right to be the exclusive fire alarm service provider in Orland FPD, see R. 473 at 63 (769:4-10). This means that Tyco receives $65.50 from each Orland FPD customer. Tyco charges an average of $68.98 for direct connection services in other jurisdictions in the northern Illinois region. See R. 474 at 304 (1158:13-23). The record does not reflect whether Tyco remits a fee to the relevant municipal entity in those jurisdictions. By contrast, Alarm Detection charges $55 or less for central station monitoring service. See R. 471 at 160 (160:6-13). It is undisputed that direct connect is typically more expensive because it requires creation of an alarm monitoring "board" for every 911 dispatch jurisdiction, whereas a central station's single board can monitor alarms from multiple jurisdictions. See R. 472 at 163-64 (163:22-164:8).
Alarm Detection argues that the exclusionary effects of the Orland FPD arrangement could be remedied by implementing certain technological or systematic adjustments. See R. 481 at 6; R. 502 at 10-11. Tyco and Orland FPD argue that none of these options complies with the Villages' ordinances mandating a direct connect system.
Conclusions of Law
Alarm Detection claims that its exclusion from the Orland FPD market violates the Sherman Act, the Clayton Act, and the Fourteenth Amendment, and unjustly enriches Defendants in violation of Illinois law. Alarm Detection also brings these claims against Defendants with respect to the services they provide in the Lemont Fire Protection District ("Lemont FPD," a former defendant in this case that settled the claims against it at the pleading stage, see R. 211). The Court addresses each claim to the extent necessary to render a verdict.
I. Lemont FPD and the Clayton Act
Before turning to the Orland FPD arrangement that is the primary focus of Alarm Detection's claims, the Court addresses several claims Alarm Detection has made regarding Defendants' conduct in the Lemont FPD. In addition to providing direct connect fire alarm monitoring and 911 dispatch services in Orland FPD, Tyco and Orland FPD provide these services to residents of the Lemont FPD, respectively. Alarm Detection claims that this arrangement with Lemont FPD also precludes Alarm Detection from providing fire alarm services there.
Very little evidence regarding the arrangement in Lemont FPD was presented at trial. But the evidence presented undermines Alarm Detection's claims. Alarm Detection's executive vice president testified that Lemont FPD does not have a direct connect mandate, customers in Lemont FPD may use central station fire *611 alarm monitoring, Alarm Detection has 44 accounts in Lemont FPD, and Alarm Detection uses its own transmitters and does not have to buy or lease them from Tyco. R. 472 at 82-83 (439:5-440:6). Based on this evidence, the Court finds that Alarm Detection is not in fact precluded from competing in Lemont FPD. Therefore, the Court finds for Defendants on Alarm Detection's claims about Lemont FPD.
In addition to its claims about exclusion from Lemont FPD, Alarm Detection continues to claim injury based on Lemont FPD's allegedly illegal assignment of customer contracts to Tyco. R. 481 at 14 n.7; id. at 18. This is apparently Alarm Detection's only remaining basis for a Clayton Act claim. See id. at 14. n.7. But the Court rejected this claim earlier in the case and sees no basis to reconsider. See R. 237 at 19-24 ( Alarm Detection Sys., Inc. v. Orland Fire Protection Dist. , 129 F.Supp.3d 614, 626-28 (N.D. Ill. 2015) ).
Alarm Detection also claims a Fourteenth Amendment violation because Orland FPD is monitoring alarms in Lemont FPD, which is allegedly outside its jurisdiction, and beyond its statutory authority. R. 481 at 18. But the agreement between Orland FPD and Lemont FPD (an exhibit admitted at trial, see J-011) shows that Orland FPD provides 911 dispatch service to Lemont FPD customers, and Tyco uses the Orland FPD dispatch center to provide direct connect alarm services for customers in Lemont FPD who want that service. See R. 473 at 68-71 (774:4-777:11). Moreover, to the extent Orland FPD can be said to be monitoring fire alarms in Lemont FPD in violation of the District Act, this cannot form the basis of a Fourteenth Amendment claim because Alarm Detection has failed to show an injury-i.e., it has failed to show that it is excluded from the Lemont FPD market.
II. Sherman Act
A. Statute of Limitations
Turning to Alarm Detection's Sherman Act claims, Defendants argue that they are untimely, because Tyco has had an exclusive contract to service the Orland FPD district since at least 2003, see R. 478 at 6, and Alarm Detection did not file this case until 2014. Under the federal antitrust laws, a plaintiff must bring a lawsuit "within four years after the cause of action accrued." 15 U.S.C. § 15b. An antitrust "cause of action accrues and the statute of limitations begins to run when a defendant commits an act that injures a plaintiff's business." Zenith Radio Corp. v. Hazeltine Research, Inc. , 401 U.S. 321, 338, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971) ; see also In re Copper Antitrust Litig. , 436 F.3d 782, 789 (7th Cir. 2006). Thus, the "period of limitations for antitrust litigation runs from the most recent injury caused by the defendants' activities rather than from the violation's inception." Xechem, Inc. v. Bristol-Myers Squibb Co. , 372 F.3d 899, 902 (7th Cir. 2004).
The Seventh Circuit has held that "exclusion from a market"-the type of injury Alarm Detection alleges here-"is a conventional form of antitrust injury that ... [accrues] as soon as the exclusion occurs." Brunswick Corp. v. Riegel Textile Corp. , 752 F.2d 261, 271 (7th Cir. 1984). However, "[e]ach discrete act with fresh adverse consequences starts its own period of limitations." Xechem , 372 F.3d at 902. "New exclusionary acts" that "extend the period" of exclusion suffice to restart the statute of limitations. Id. By contrast, "acts that 'simply reflect or implement a prior refusal to deal or acts that are merely inertial consequences (of a single act) do not restart the statute of limitations.' "
*612 Midwestern Machinery Co., Inc. v. Nw. Airlines, Inc. , 392 F.3d 265, 270 (8th Cir. 2004) (quoting DXS Inc. v. Siemens Med. Sys., Inc. , 100 F.3d 462, 467-68 (6th Cir. 1996) ); see also In re Ciprofloxacin Hydrochloride Antitrust Litig. , 261 F.Supp.2d 188, 229 (E.D.N.Y. 2003) (Mere "[p]erformance of the alleged anticompetitive contract[ ] during the limitations period ... is not sufficient to restart the [limitations] period.").
Alarm Detection argues that the renewal of the contract between Orland FPD and Tyco in 2014, and the passage of the Villages' direct connect ordinances that same year, are new exclusionary acts that extended Alarm Detection's exclusion from the Orland FPD market. The Court agrees that these actions are more than mere inertial consequences of prior agreements and ordinances. Rather, they are evidence of a conscious effort to continue the arrangement that is the basis for Alarm Detection's claims. Therefore, Alarm Detection's antitrust claims are timely.
B. Section 1: Contract, Combination, or Conspiracy
Alarm Detection alleges that Defendants' actions violate Section 1 of the Sherman Act. "The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition." Agnew v. Nat'l Collegiate Athletic Ass'n , 683 F.3d 328, 334-35 (7th Cir. 2012). To prevail on a Section 1 claim, a plaintiff must prove: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury." Id. at 335. Alarm Detection contends that it proved these elements at trial by presenting, respectively, evidence of: (1) the "Orland FPD/Tyco agreements plus Village Ordinances passed at the urging of and for the benefit of Orland FPD"; (2) that Defendants have "virtually 100% control of the Business"; and (3) the "Commercial Accounts have no choice, pay higher prices, and [Alarm Detection] cannot actively compete for the Business." R. 481 at 7.
Although Alarm Detection alleges that the Villages' ordinances are part of the "arrangement" constituting the alleged "contract, combination, or conspiracy" satisfying the first element of its claims, Alarm Detection has not sued the Villages, and Alarm Detection does not argue that the Villages' ordinances are preempted by the Sherman Act. Rather, Alarm Detection's primary goal is to have the agreement between Orland FPD and Tyco invalidated. However, when a state statute or local ordinance is alleged to be an aspect of the defendants' alleged "contract, combination, or conspiracy," as Alarm Detection claims here, an analysis of the federal antitrust implications of such alleged concerted action must begin with the role played by the local law.
In Fisher v. City of Berkeley , the Supreme Court explained the standards for such an analysis. 475 U.S. 260, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). "A restraint imposed unilaterally by government does not become concerted-action within the meaning of the [Sherman Act] simply because it has a coercive effect upon parties who must obey the law. The ordinary relationship between the government and those who must obey its regulatory commands whether they wish to or not is not enough to establish a conspiracy." Id. at 267, 106 S.Ct. 1045. Accordingly, legislation that is properly characterized as "unilateral" is "outside the purview of § 1 [of the Sherman Act]." Id.
But, this is not true of "all restraints imposed upon private actors by government." Id. "Certain restraints may be characterized as 'hybrid,' in that nonmarket mechanisms merely enforce private *613 marketing decisions." Id. at 267-68, 106 S.Ct. 1045. "Where private actors are thus granted a degree of private regulatory power, the regulatory scheme may be attacked under § 1." Id. at 268, 106 S.Ct. 1045. At bottom, however, "a government restraint [does not] become concerted action because certain citizens benefit from it, or even have urged it." Freedom Holdings, Inc. v. Cuomo , 624 F.3d 38, 53 (2d Cir. 2010) (citing City of Columbia v. Omni Outdoor Aderv., Inc. , 499 U.S. 365, 375, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) ("conspiracy" must "mean ... more than an agreement to impose [a] regulation").
Fisher concerned an ordinance that kept residential rents artificially low in Berkeley, California. Property owners alleged that the ordinance was preempted by Section 1 of the Sherman Act. The Supreme Court held that "[w]hile the Ordinance does give tenants-certainly a group of interested private parties-some power to trigger the enforcement of its provisions, it places complete control over maximum rent levels exclusively in the hands of the [city's] Rent Stabilization Board." Fisher , 475 U.S. at 269, 106 S.Ct. 1045.
The Court distinguished the unilateral action by the City of Berkeley from state and local legislation the Court struck down in prior cases. In Schwegmann Brothers v. Calvert Distillers , a Louisiana statute authorized liquor distributors to enforce price fixing agreements (which were then legal pursuant to a since-repealed exception to the federal antitrust laws) against retailers who were not parties to the agreements. 341 U.S. 384, 387, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). The Court held the state statute was preempted by the Sherman Act because "both the selection of minimum price levels and the exclusive power to enforce those levels were left to the discretion of distributors." Fisher , 475 U.S. at 268, 106 S.Ct. 1045 (citing Schwegmann , 341 U.S. at 389, 71 S.Ct. 745 ). Similarly, in California Retail Liquor Dealers v. Midcal Aluminum , a California statute required wine producers to post a retail price schedule, and gave wine wholesalers the power to set prices for a producer that failed to do so. 445 U.S. 97, 99, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). The Court in Fisher explained that "the mere existence of legal compulsion" in Midcal "did not turn California's scheme into unilateral action by the State." Fisher , 475 U.S. at 269, 106 S.Ct. 1045 (citing Midcal , 445 U.S. at 103, 100 S.Ct. 937 ). Rather, under the statute, the " 'State [had] no direct control over wine prices, and it does not review the reasonableness of the prices set by wine dealers.' " Fisher , 475 U.S. at 269, 106 S.Ct. 1045 (quoting Midcal , 445 U.S. at 100, 100 S.Ct. 937 ); see also TFWS Inc. v. Schaefer , 242 F.3d 198, 209 (4th Cir. 2001) (state statute requiring liquor wholesalers to post and maintain monthly prices, and banning volume sale discounts, was a hybrid restraint because it did not provide for state "review" of the "privately set prices for reasonableness"). Such "hybrid" statutes can be violations of the Sherman Act if the law's other elements are satisfied.
Since Fisher was issued more than 30 years ago, courts have had relatively infrequent occasion to apply its standard of unilateral versus hybrid restraint. Four cases are of particular relevance here.
In Yakima Valley Memorial Hospital v. Washington State Department of Health , the Washington State Department of Health refused to license a hospital to perform certain elective heart surgery procedures. 654 F.3d 919, 923 (9th Cir. 2011). The Department limited licenses for such procedures "to avoid private parties making socially inefficient investments in health-care resources they might make if left unregulated." Id. Additionally, *614 the Department would "issue a [license] only if projected demand in an applicant's geographic market exceed[ed] the capacity of incumbent [license] holders by at least 300 procedures." Id. at 924. The Ninth Circuit disagreed with the plaintiff hospital's argument that the "regulations grant regulatory power to incumbent licensees by calculating the need for a new [license] based in part on the number of ... procedures they perform, thereby allowing the incumbent licensees to manipulate the number of [procedures] they perform so as to exclude competing hospitals [from obtaining a license]." Id. at 928. The court explained that the plaintiff hospital's argument "mistakes the barrier to entry created by the licensing requirement, and its attendant anticompetitive effects, for a hybrid restraint." Id. at 929. The court reasoned that "a licensee meet[ing] the Department's expectation and suppl[ying] all demand is the logical and intended consequence of the ... regulations, not a delegation of regulatory power to the incumbent. Entry is prohibited by the Department's decision to grant an unlimited license and then withhold additional licenses until the incumbent can no longer meet demand, not the incumbent's natural inclination to capitalize on the market power the licensing requirement creates." Id.
Three years before Yakima , the Ninth Circuit considered a case challenging the State of Washington's restrictions on sales of beer and wine. See Costco Wholesale Corp. v. Maleng , 522 F.3d 874, 881 (9th Cir. 2008). One of the challenged state restrictions banned alcohol sales by retailers to other retailers, effectively forcing a business to decide whether to operate as a retailer or a wholesaler. Id. at 889-90. The court explained that the "ban removes from the market certain firms or persons who might otherwise compete; with fewer, and likely larger, horizontal competitors, prices for the consumer may be higher than they otherwise would be." Id. at 890. The court held, however, that "the potential anti-competitive effect is not the result of private pricing or marketing decisions, but the logical and intended result of the statute itself. No further action is necessary by the private parties because the anti-competitive nature of this restraint is complete upon enactment; the conclusion must follow, therefore, that the restraint is unilateral." Id.
In holding that the ban on retailer to retailer sales was a unilateral restriction on competition, the Ninth Circuit relied heavily on a decision from the First Circuit. In Massachusetts Food Association v. Massachusetts Alcoholic Beverages Control Commission , an association of alcoholic beverage sellers sued a state commission that limited the number of licenses to operate a retail liquor store to three per person or corporate entity. 197 F.3d 560, 562 (1st Cir. 1999). Of course, an agreement among retailers not to open more than three locations each would violate the Sherman Act. But the First Circuit held that the state regulation licensed no such agreement among private parties. See id. at 565 ("What is centrally forbidden is state licensing of arrangements between private parties that suppress competition-not state directives that by themselves limit or reduce competition."). The court rejected the plaintiffs' claim because "the state has not ordered or authorized private parties to engage in conduct that, absent immunity, would even arguably violate the antitrust laws; there is no private agreement or arrangement between retailers as to the number of retail outlets and therefore no violation to be shielded. The state simply insists upon licensing retail liquor stores-as it does for many businesses or professions-and limits the number *615 of licenses to three per owner." Id. at 564.
Ten years before Massachusetts Food , in a case closely analogous to Alarm Detection's claims, the Third Circuit upheld a municipality's choice of an exclusive electrical inspector to certify buildings for occupancy. See Englert v. City of McKeesport , 872 F.2d 1144, 1146-47 (3d Cir. 1989). A single company had been providing nearly all the inspections in the municipality "for some time" without having been granted an exclusive right to do so by the city. Id. at 1146. When the company began facing competition from a former employee, the city passed a resolution banning such competition and making the company the exclusive provider of electrical inspections for certificates of occupancy. Id. The former employee sued for violation of the Sherman Act, but conceded that there was "little evidence which would support an inference that [the company] induced that passage of the ... resolution." Id. at 1150 n.9. The Third Circuit held that the company's "acceptance ... of the unilateral appointment by [the city]" did "not involve concerted action," and thus there could be no violation of the Sherman Act. Id. at 1151.
What Fisher and its progeny teach is that state and local governments may act as market makers and destroyers without running afoul of the federal antitrust laws. However, state and local government may not delegate that power to private parties. In other words, governments must not enable anticompetitive conduct. The government entity's decision to alter the market must be complete upon enactment of the government's decision, and require no further anticompetitive conduct to create the market conditions envisioned by government authorities.
Here, Alarm Detection has not sued the Villages and does not ask the Court to find that the Villages' ordinances are preempted. But the evidence shows that the Villages' direct connect ordinances require alarm signals to be sent directly from fire alarms to Orland FPD's 911 dispatch center. The parties have also implicitly conceded (see footnote 1 above) that dual monitoring technology, i.e., a fire alarm that can send a signal to both Orland FPD's 911 dispatch and a central station, is not available or economically feasible. This combination of municipal regulation and technological/economic limitation eliminates alarm monitoring by any private alarm company other than the company hired to maintain Orland FPD's 911 dispatch center. Granting an exclusive contract for maintenance of the dispatch center is a proper exercise of the Orland FPD's power to contract under the District Act. See Active Disposal, Inc. v. City of Darien , 635 F.3d 883, 889 (7th Cir. 2011) (exclusive contracts "are a foreseeable result of [the] authorization for municipalities to make contracts"). Thus, there is a direct causal connection between the Villages' requirement for direct connect alarm monitoring and the allegedly anticompetitive effect in this case-i.e., the need for an exclusive provider of fire alarm monitoring in Orland FPD. Although there are several steps in this causal chain, the Court finds that the causal connections are sufficiently direct that the effect of an exclusive fire alarm monitoring provider in Orland FPD is the "logical and intended result" of the Villages' ordinances.
The Court further finds that this restraint is "complete upon enactment." Orland FPD and Tyco of course have certain discretion to implement the ordinances, which is embodied in their contract. But the anticompetitive effect at issue-i.e., the existence of an exclusive contract (whether with Tyco or another alarm company)- is *616 not within the discretion or control of Orland FPD or Tyco. The Villages require a direct connection to the Orland FPD 911 dispatch center, and an exclusive contract with a fire alarm provider is the only way to accomplish that goal. The Villages' ordinances, therefore, together constitute a "unilateral restraint" that involves no concerted action and therefore cannot be a violation of the Sherman Act. See Alarm Det. Sys., Inc. v. Village of Schaumberg , 2017 WL 3780279, at *12 (N.D. Ill. Aug. 31, 2017) (denying a preliminary injunction motion because "[o]nly after the Village passed [a direct connect] [o]rdinance ... did Tyco allegedly become the exclusive provider of fire alarm monitoring equipment in the Village" through an agreement with the municipal entity responsible for 911 dispatch).
Alarm Detection misses the mark with its argument that "the Supreme Court has classified arrangements that authorize private actors, like Tyco here, to set prices or participate in setting prices, as hybrid restraints." R. 502 at 4. The Sherman Act forbids price fixing agreements , not a single company's right to set the prices at which it will do business. In Schwegmann and Midcal , the Supreme Court found the statutes at issue preempted because they involved government consent for agreements among multiple private actors to set the price they would charge customers. That is not the situation in the fire alarm protection market in Orland FPD. Rather, as discussed, the Villages require direct connect to Orland FPD's dispatch, and Orland FPD has hired Tyco to maintain the dispatch center. Due to current technological and/or economic limitations that prevent the use of dual-frequency transmitters, these governmental decisions have the direct effect of making Tyco the exclusive provider of fire alarm services in Orland FPD. And like the defendants in Yakima and Englert , Tyco has a role in setting the prices it will charge for its services, which it exercises through negotiation with Orland FPD, a governmental entity. This is not the kind of price-fixing agreement among multiple private entities the Supreme Court struck down in Schwegmann and Midcal.
Alarm Detection attempts to distinguish Englert by noting that the ordinance in Englert expressly made the defendant company the exclusive electrical inspector, whereas the Villages ordinances do not make Tyco or any other alarm company the exclusive alarm company for Orland FPD. But as discussed, the evidence shows that the only way to comply with a direct connect requirement to a specific dispatch center-an option a village or fire protection district can indisputably mandate-is to enter into an exclusive contract with a single fire alarm company. The lack of an express choice by the Villages does not change the fact that some company must be given an exclusive contract under the circumstances.
Alarm Detection also argues that the exclusive nature of a direct connect mandate could be remedied by use of different technology. But Alarm Detection concedes that the purpose the Villages' ordinances is "to eliminate any intervening call from a central station operator." R. 502 at 9. The two alternatives Alarm Detection describes in its supplemental brief would not satisfy this goal.[4] Alarm Detection first asserts that it "and other alarm companies could use the same radio frequency as Tyco to send [s]ignals from their own transmitters to Orland Central Dispatch." R. 502 at 10.
*617 True, but neither Defendants nor the Villages prohibit this. The problem with this "solution," as Alarm Detection has pointed out, see R. 471 at 29-30 (29:17-30:7), is that even if it transmitted signals on Tyco's frequency, Alarm Detection would be subject to the costs of replacing or recalibrating its transmitters with Tyco's frequency. Further, if Alarm Detection sends signals directly to Orland FPD 911 dispatch, Alarm Detection cannot monitor those signals (since transmitters with dual transmission ability are apparently not available) and the exclusive monitoring aspect remains.
Alarm Detection's additional suggestion is that it could "automatically retransmit the [s]ignals to eliminate the need to have a central station operator process the [s]ignals before they were sent to Orland Central Dispatch." R. 502 at 10. But this is obviously not a direct connection to Orland FPD's 911 dispatch. Alarm Detection never explains why a midpoint "retransmission" of the signals would comply with ordinances that require "direct connection." Alarm Detection insists that the retransmission would be "instantaneous." Id. But the evidence presented at trial on this issue was at best inconclusive. Further, time is not necessarily the only concern. With an additional retransmission point there is additional potential for a breakdown in the system. Clearly, the Villages intended that one alarm company be responsible for the reception of alarm signals in Orland FPD-a decision squarely within the Villages authority. Adding a retransmission point undermines that goal.
For these reasons, the Court finds that Alarm Detection has not met its burden to prove concerted action that implicates Section 1 of the Sherman Act. Therefore, the Court finds for Defendants on that claim.
C. Section 2: Monopoly
Only Section 1 of the Sherman Act includes an explicit "concerted action" element. However, unilateral state action also undermines a claim for violation of Sherman Act Section 2, because that provision requires "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Endsley v. City of Chicago , 230 F.3d 276, 282 (7th Cir. 2000). As discussed, Orland FPD's and Tyco's agreement on an exclusive fire alarm monitoring contract was a necessary result of the Villages' requiring direct connect fire alarm monitoring in the context of the current technological environment as it pertains to alarm transmitters. In these circumstances, Tyco cannot be said to have "willfully" acquired a monopoly. It is unnecessary for the Court to decide whether Tyco's business in Orland FPD constitutes a monopoly for purpose of the Sherman Act. But to the extent that it is properly characterized as such, Tyco simply accepted a monopoly that was made available to it by governmental entities. Other courts have found similar conduct insufficient to satisfy the "willful acquisition" element of Section 2. See Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers , 795 F.3d 1124, 1132 (9th Cir. 2015) ("Even if [the defendant private association] competed in any of the relevant markets, § 2 liability could only arise if [the defendant] unlawfully acquired or maintained its monopoly. The district court correctly held that [the defendant's] authority was lawfully obtained through a contract with the [Department of Commerce]."); Englert , 872 F.2d at 1150 ("To prove that [the defendant company] has 'willfuly acquired' monopoly power, [the plaintiff's] burden under section 2 was essentially the same as under section 1: he was required to prove that [the defendant *618 municipality] did not unilaterally decide to grant and an exclusive franchise to [the defendant company], but that [the defendant company] contributed to the passage of the resolution, thus willfully obtained a monopoly."). Thus, the Court finds that the unilateral nature of the Villages' ordinances and their effects requires finding for Defendants on Alarm Detection's claim under Section 2 of the Sherman Act.
D. Immunity
The Court has found that Defendants' conduct was not "concerted" or "willful" in the sense those terms are used by Sections 1 and 2 of the Sherman Act. Alternatively, the Court finds Defendants are immune from liability for any anticompetitive effects caused by their conduct under the state immunity and Noerr- Pennington doctrines, holdings the Court explains presently.
1. Orland FPD: State Immunity
States have immunity for anticompetitive conduct "when acting in their sovereign capacity." N.C. State Bd. of Dental Examiners v. F.T.C. , --- U.S. ----, 135 S.Ct. 1101, 1110, 191 L.Ed.2d 35 (2015). However, when "a State delegates control over a market to a non-sovereign actor," such as a municipality, immunity is not always available. Id. For a municipality to have immunity from the federal antitrust laws, the state must have "articulated a clear policy to allow the anticompetitive conduct." Id. at 1112. This "requirement is satisfied where the displacement of competition is the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature." Id. In other words, although "a state legislature need not expressly state ... that [it] intends for the delegated action to have anticompetitive effects," F.T.C. v. Phoebe Putney Health Sys., Inc. , 568 U.S. 216, 226, 133 S.Ct. 1003, 185 L.Ed.2d 43 (2013), "the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." Dental Examiners , 135 S.Ct. at 1112. "All that matters is whether the anti-competitive effects would logically result from the authority to regulate." Active Disposal , 635 F.3d at 889 (quoting Campbell v. City of Chicago , 823 F.2d 1182, 1184 (7th Cir. 1987) ).
In addition to demonstrating that the state clearly articulated a policy to allow the anticompetitive conduct at issue, non-sovereign state-actors other than municipalities must show that the state "provides active supervision of the anticompetitive conduct." Dental Examiners , 135 S.Ct. at 1112. The Supreme Court has held that municipalities need not satisfy this additional requirement because "where the actor is a municipality, there is little or no danger that it is involved in a private price-fixing arrangement." Id. This is because "municipalities are electorally accountable and lack the kind of private incentives characteristic of active participants in the market." Id. Further, most municipalities "exercise[ ] a wide range of governmental powers across different economic spheres, substantially reducing the risk that [they] would pursue private interests while regulating any single field." Id. at 1112-13.
This case presents unusual circumstances for application of the state immunity doctrine because the actions of two different kinds of governmental entities are involved-the Villages and Orland FPD. Addressing the Villages first, it is likely that they would be immune from any antitrust liability that might arise from their ordinances. Municipalities in Illinois regulate fire alarm protection pursuant to Article 11 of the municipal code, and the Illinois legislature has stated its "intention ... that the 'State action exemption' to the *619 application of federal antitrust statutes be fully available to all municipalities, and that agents, officers and employees of each to the extent that are exercising authority ... [pursuant to] all of Divisions of Articles 10 and 11 of the Illinois Municipal Code." 65 ILCS 5/1-1-10(b). Direct connect fire alarm monitoring has been mandated by some Illinois municipalities at least since 1999 when the ordinance at issue in Hinsdale was adopted. 260 Ill.Dec. 599, 761 N.E.2d at 786. Although there is no express statutory permission for municipalities to take anticompetitive action in the realm of fire alarm monitoring, the fact that municipalities have been adopting direct connect ordinances for many years has made their effect apparent, not merely foreseeable. This apparent tolerance of such actions by the Illinois legislature, combined with its express intent to permit anticompetitive actions by municipalities generally, is sufficient to show that Illinois has "articulated a clear policy to allow the anticompetitive conduct" at issue here. See Village of Schaumberg , 2017 WL 3780279, at *11 (denying preliminary injunction of defendant village's fire alarm ordinance because it was likely that the village was immune (citing Campbell , 823 F.2d at 1185 ("[T]he Illinois General Assembly's passage of [ 65 ILCS 5/1-1-10 ] supports the proposition that the state legislature intended reasonably foreseeable anticompetitive acts from its grant of power to municipalities.") ).
The fact that the Villages are immune begs the question of whether the Villages' immunity suffices to immunize their sibling governmental entity, Orland FPD. In the Fisher analysis, the Villages' unilateral conduct served to demonstrate that further actions by Orland FPD were not part of a conspiracy implicating the Sherman Act. But the state immunity analysis usually applies only in a case were hybrid concerted action is present. See Fisher , 475 U.S. at 270, 106 S.Ct. 1045 ("[U]nder settled principles of antitrust law, the [ordinance] lack[s] the element of concerted action needed ... [to find] that [it] is facially inconsistent with the federal antitrust laws. We therefore need not address whether, even if the controls were to mandate § 1 violations, they would be exempt under the state-action doctrine from antitrust scrutiny."); Yakima Valley , 654 F.3d at 926 n.8 (since the court decided the case based on a Fisher analysis, the court did "not need to reach the question of state-action immunity"). And unlike unilateral state action, which serves to characterize a regulatory arrangement as a whole, the question of immunity is particular to each entity involved. Thus, in analyzing immunity, the Court must separately address the potential immunity of each party to the arrangement, and any immunity the Villages may have does not trickle down to Orland FPD.
The state statute granting municipalities antitrust immunity under Sections 10 and 11 of the Illinois Municipal Code does not apply to fire protection districts like Orland FPD. Instead, Orland FPD's authority is provided by the District Act. The District Act does not include an express grant of antitrust immunity. But under the District Act, a fire protection district has the authority to adopt an ordinance requiring direct connect fire alarm systems. The District Act also gives the "Board of Trustees of any fire protection district" the power to "contract with any corporation organized to furnish fire protection service." 70 ILCS 705/11a.
In Active Disposal v. City of Darien (a case not cited by the parties in their trial briefs), the Seventh Circuit applied the state-action immunity doctrine to a case like this. 635 F.3d at 888-89. In that case, certain Illinois municipalities gave exclusive contracts to certain companies to lease *620 dumpsters to residents within the municipalities. Id. at 885. The court noted that "[w]hile these contracts often have a financial benefit for the municipality, they also impose a cost on consumers who would prefer a different, probably less expensive, trash hauler." Id. The court held these "anti-competitive effects are a foreseeable result of [the] authorization for municipalities to make contracts." Id. at 889 ; see also id. ("[W]hen the legislature provides that municipalities may contract for the collection and disposition of trash, those contracts will often be exclusive, a monopoly will be created, and anti-competitive effects will necessarily follow."); LaSalle Nat. Bank of Chi. v. DuPage County , 777 F.2d 377, 381-82 (7th Cir. 1985) (by granting municipalities the power to make contracts the state has granted them the power to make exclusive contracts). The Tenth Circuit followed similar logic in holdings that a municipality was immune under the state-action doctrine. See Southern Disposal, Inc. v. Texas Waste Mgmt. , 161 F.3d 1259, 1263-64 (10th Cir. 1998) ("Even though the Solid Waste Management Act does not expressly authorize anti-competitive conduct or exclusive contracts, such arrangements are the foreseeable result of allowing municipalities to contract with 'one or more other ... persons' for waste disposal services. We find the statute permits exactly the type of contract the City entered into with Texas Waste Management, and it clearly articulates and affirmatively expresses a state policy to displace competition with regulation.").
The statute at issue in Active Disposal contained a separate section providing that municipalities may adopt ordinances "notwithstanding the fact that competition may be displaced or that such ordinance may have an anti-competitive effect." 65 ILCS 5/11-19-5. But the Seventh Circuit held that the municipalities' authority to enter into the contracts at issue was not derived from the section concerning ordinances , but from the section expressly providing the power to contract. Nor did the court rely on the general grant of antitrust immunity to Illinois municipalities in 65 ILCS 5/1-1-10 discussed above. The court was clear that the mere authority to make contracts in a certain field (trash hauling in Active Disposal ; fire protection in this case) is sufficient to establish that the making of exclusive contracts is foreseeable. The Tenth Circuit agreed in Southern Disposal. This Court finds this reasoning persuasive, if not (entirely) binding, and holds that Orland FPD's power to contract in the area of fire alarm protection made its exclusive contract with Tyco foreseeable.
Non-sovereign state actors other than municipalities must also show that they "provide active supervision of the anticompetitive conduct." Dental Examiners , 135 S.Ct. at 1112. Although Orland FPD is not a municipality per se, it is also not the type of non-sovereign state actor to which the Supreme Court has applied the "active supervision" requirement. That requirement is generally applied to state professional and industry review boards made up of appointed private individuals in the relevant profession or industry. By contrast, fire protection districts are governed by elected officials. That fire protection district officials are responsible to voters removes the basis for the Supreme Court's imposition of the "active supervision" requirement. For these reasons, the Court does not believe that requirement is relevant to whether Orland FPD is immune from antitrust liability.
However, even if that requirement is relevant, it is satisfied here. Tyco's discretion is completely circumscribed by its contract with Orland FPD. This agreement is for a set term and has been periodically adjusted according to Orland FPD's needs.
*621 Further, Orland FPD has a role in receiving fire alarm signals at its 911 dispatch center. This is not a case where Tyco has complete discretion over its activities in Orland FPD. Thus, Orland FPD provides active supervision of Tyco's conduct.
Therefore, the Court holds that Orland FPD is immune from any liability arising from its contract with Tyco.
2. Tyco: Noerr-Pennington Immunity
Tyco argues that it is entitled to immunity under the Noerr- Pennington doctrine. The Noerr- Pennington doctrine originated as protection for concerted action by private actors in petitioning the government. While "petitioning" is customarily understood as "legislative lobbying," the Supreme Court has interpreted that term to include additional types of interaction with government by private entities. See VIBO Corp., Inc. v. Conway , 669 F.3d 675, 684 (6th Cir. 2012) (" 'petitioning' ... encompass[es] activities other than legislative lobbying"). Particularly relevant here, the Noerr- Pennington doctrine "protects private actors when they ... enter contracts with the government." VIBO , 669 F.3d at 684 (citing Sanders v. Brown , 504 F.3d 903, 912 (9th Cir. 2007), and Greenwood Utils. Comm'n v. Miss. Power Co. , 751 F.2d 1484, 1505 (5th Cir. 1985) ); see also Campbell , 823 F.2d at 1186 (explaining that "the antitrust laws do not apply to efforts to persuade the government to organize or support a cartel," and holding that two defendant taxi cab companies were immune from liability for their agreement with Chicago to drop certain lawsuits in return for passage of an ordinance that gave the two taxi cab companies 80% of the taxi licenses in the city); AmeriCare MedServices, Inc. v. City of Anaheim , 2017 WL 5592892, at *4 (C.D. Cal. Apr. 21, 2017) ("[A]ny conduct by [the defendant private entity] to petition the City Defendants to grant it an exclusive contract plainly falls within the scope of Noerr- Pennington immunity."); Omega Homes, Inc. v. City of Buffalo , 4 F.Supp.2d 187, 193-94 (W.D.N.Y. 1998) (holding that successful lobbying efforts to secure an exclusive contract to build a low-income housing development were protected by Noerr- Pennington ).
Here, Alarm Detection's claims against Tyco are predicated upon Tyco's actions to secure adoption of the Villages' direct connect ordinances and the exclusive agreement with Orland FPD. The cases cited above show that Tyco's actions are squarely within the realm of activity courts have found is protected by the Noerr- Pennington doctrine.
Alarm Detection's primary argument as to why these actions should not receive Noerr- Pennington immunity is that Orland FPD acted as a commercial entity. See R. 487 at 9 (citing Wheeling-Pittsburgh Steel Corp. v. Allied Tube & Conduit Corp. , 573 F.Supp. 833, 838 (N.D. Ill. 1983) (" Kurek stands for the proposition that the Noerr- Pennington doctrine does not apply where the governmental body acted as a commercial entity (citing Kurek v. Pleasure Driveway and Park Dist. of Peoria , 557 F.2d 580, 592 n.10 (7th Cir. 1977) ) ). But the Seventh Circuit has never denied Noerr- Pennington immunity based on a "commercial exception," and the authority for the existence of such an exception is weak, at best. The idea of a "commercial exception" originated with a First Circuit decision from 1970 holding that Noerr- Pennington immunity does not extend to efforts by private business to sell products to public officials acting under competitive bidding statutes. See George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc. , 424 F.2d 25 (1st Cir. 1970). But the Pennington case itself immunized government coal purchases. See *622 United Mine Workers of Am. v. Pennington , 381 U.S. 657, 671, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). On that basis, many courts have questioned the existence or viability of a "commercial exception." See Doron Precision Sys., Inc. v. FAAC, Inc. , 423 F.Supp.2d 173, 191 (S.D.N.Y. 2006) (citing cases); Santana Prods., Inc. v. Bobrick Washroom Equip., Inc. , 249 F.Supp.2d 463, 489-91 (M.D. Pa. 2003) (citing cases).
Moreover, this case is not about the Villages or Orland FPD making purchases in the fire alarm monitoring market (as was true of the defendant fire protection district in Lisle-Woodridge ). Rather, the effect of the Villages' ordinances is to define the market for fire alarm monitoring in Orland FPD in the first place. The evidence simply does not support Alarm Detection's contention that Orland FPD is acting as a commercial entity. Thus, to the extent there is a "commercial exception" to the federal antitrust laws, it does not apply in this case.
Alarm Detection also argues that the "sham exception" should apply because "Tyco has promoted outdated technology and supported the District's misunderstanding of response times and denial of alternative means of transmission [s]ignals, even though these positions were inconsistent with its own positions in Lisle-Woodridge. " R. 487 at 9-10. The Court finds Alarm Detection's contention that Orland FPD's fire safety professionals would or could be fooled by such allegedly false information to be questionable at best. But even if Alarm Detection's contentions were true, and could be characterized as a "sham," they are not the kind of sham that serves as a basis to deny Noerr- Pennington immunity. The sham exception to Noerr- Pennington prevents the application of immunity where a defendant's act of "petitioning" was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." City of Columbia v. Omni Outdoor Advert., Inc. , 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991). This exception "encompasses situations in which persons use the governmental process -as opposed to the outcome of that process-as an anticompetitive weapon." Id. "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so through improper means." Id. One "classic" example of sham petitioning is where a defendant files "frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." Id. For example, denying meaningful access to the "appropriate city administrative and legislative fora" may constitute improper or even unlawful lobbying, but it does not necessarily constitute a "sham." Id. at 381, 111 S.Ct. 1344.
At most, Alarm Detection contends that Tyco has used false information in an attempt to secure an exclusive contract for the Orland FPD market. The evidence supporting this contention is inconclusive at best. But to the extent Tyco's tactics could be described as "improper," they still do not constitute a basis to deny immunity to Tyco, because there is no evidence that Tyco did not genuinely desire to achieve an exclusive contract for fire alarm monitoring in Orland FPD. And there is no evidence that Tyco sought to abuse the governmental process in order to impede Alarm Detection's business in particular, as opposed to seeking to gain a greater share of the market, no matter the competitor. Absent such evidence, the sham exception does not apply.
For these reasons, even if Tyco could be found to have engaged in concerted action *623 in violation of Section 1, or willful acquisition of monopoly power in violation of Section 2, Tyco is immune from any such liability.
III. Fourteenth Amendment
Alarm Detection also claims that Tyco's and Orland FPD's actions constitute violations of the Equal Protection and Due Process clauses of the Fourteenth Amendment. The Court previously held that these claims were time-barred. Alarm Detection has filed a motion to reconsider that holding. R. 488.
A. Statute of Limitations
In its previous decision, the Court held that Alarm Detection's pleadings demonstrated that it had been excluded from the Orland FPD market at least since 2003 when Orland FPD signed an exclusive agreement with Tyco. Despite the age of this exclusion, Alarm Detection argued then, and argues again, that the 2014 contract constitutes a new and discrete act that is within the statute of limitations. R. 125 at 14. The Court held that "[e]ven if such acts constituted fresh injuries to Alarm Detection's constitutional rights ... they are insufficient to trigger the application of the continuing violation doctrine, because the doctrine is reserved for only those cases where a plaintiff could not reasonably be expected to have perceived or known about the alleged violation." R. 237 at 50 ( Alarm Detection , 129 F.Supp.3d at 641 ).
The Court's holding would have been correct with respect to an attempt to make old injuries actionable. But the Court was incorrect that the notice provided by earlier conduct made actions for relief based on more recent injuries untimely. As the Court held with respect to the timeliness of Alarm Detection's antitrust claims, the 2014 ordinances and contract renewal are sufficiently overt actions to start a new statute of limitations. Since Alarm Detection brought this action in 2014, the Court reconsiders it earlier decision and finds that Alarm Detection's Fourteenth Amendment claims are timely.
B. Merits
Alarm Detection argues that Orland FPD does not have the authority under the District Act to make its agreement with Tyco. And since Orland FPD does not have the authority to make that agreement, Alarm Detection argues it is arbitrary conduct that cannot satisfy the rational basis test of the Equal Protection Clause. Specifically, Alarm Detection argues that "Orland FPD is not authorized by the District Act to [1] exclusively engage in fire alarm monitoring; [2] control the decision over transmission equipment; or [3] collect fees from its residents." R. 481 at 17-18.
As to the first two contentions, both the Villages and Orland FPD have statutory authority to require a direct connect fire alarm monitoring. Further, Orland FPD's power to contract under the District Act necessarily implies the authority to enter into exclusive contracts. Moreover, although a governmental entity's decision to enter into an exclusive contract "inherently involves a kind of discrimination," it does not violate the Equal Protection Clause when government actors merely exercise their discretion. See Corey Airport Servs., Inc. v. Clear Channel Outdoor, Inc. , 682 F.3d 1293, 1298 (11th Cir. 2012) ; see also Higgins Elec., Inc. v. O'Fallon Fire Prot. Dist. , 813 F.3d 1124, 1129 (8th Cir. 2016) ("Furthermore, a class-of-one claim does not extend to cases where the rules are uniformly applicable and a state official exercises his discretionary authority based on subjective, individualized determinations."). Thus, the mere fact that Orland FPD entered into an agreement with one fire alarm services *624 company rather than another does not demonstrate a violation of the Equal Protection Clause.
Additionally, to the extent the District Act prohibits Orland FPD itself from engaging in transmission of fire alarm signals and collecting fees from residents, Alarm Detection has not proven that Orland FPD engages in such activities. Rather, the evidence shows that Orland FPD contracts with Tyco to provide fire alarms transmission services to its residents. Alarm Detection also concedes that the $23.50 Tyco remits to Orland FPD for each commercial account is "consideration" for the right to the exclusive contract. See R. 481 at 3.
Alarm Detection also claims that Orland FPD "violated [its] due process rights because: (1) [Alarm Detection] is licensed under the Alarm Act and has a protected property interest in engaging in the Business; and (2) [Alarm Detection] was deprived of its property interest due to Defendants' arbitrary conduct." R. 481 at 17. This claim fails. First, Alarm Detection does not claim that it has lost its license under the Alarm Act. Second, Alarm Detection has cited no authority over the course of four years of litigating this case to demonstrate that it has a protected property right in the business of alarm monitoring in Orland FPD. Absent, such a property right, there can be no due process violation.
Therefore, the Court finds for Defendants on Alarm Detection's Fourteenth Amendment claims.
IV. Unjust Enrichment
The Court noted earlier in the case that Alarm Detection's claim for unjust enrichment would rise or fall with its other claims. See R. 316 at 36 ( Alarm Detection Sys., Inc. v. Orland Fire Prot. Dist. , 194 F.Supp.3d 706, 727 (N.D. Ill. 2016) (citing Cleary v. Philip Morris Inc. , 656 F.3d 511, 517 (7th Cir. 2011) ) ). That holding stands, and the Court finds for Defendants on Alarm Detection's unjust enrichment claim.
Conclusion
For the foregoing reasons, the Court finds in favor of Defendants and against Alarm Detection on all counts.[5]

The Court notes that the parties have assiduously avoided the question of whether dual-frequency transmitters are a potential solution to this dispute. When the Court specifically posed this question to Alarm Detection's counsel during his opening statement, the answer was long but non-responsive. See R. 471 at 30-32 (30:8- 32:24). During trial there was testimony that some big-box stores utilize dual-frequency transmitters, see R. 474 at 134 (988:11-21), but the issue was not addressed in post-trial briefing. The Court's order requesting supplemental briefing highlighted this testimony and explained how the Court believed the apparent unavailability of dual-frequency transmitters affected the Court's understanding of the factual circumstances of the case. See R. 499 at 2. Only Orland FPD's supplemental brief noted its agreement that such technology is not available or economically feasible. See R. 501 at 6. Alarm Detection and Tyco did not address the issue. See R. 500; R. 502. The Court concludes from this agreement/silence that dual-frequency transmitters are generally unavailable due to some combination of technological and economic circumstances.

This testimony from Orland witnesses is sufficient to prove their motivations. There was insufficient evidence presented at trial for the Court to determine the relative merits of the two systems, but such a finding is unnecessary for the Court to render a verdict in this case.

The Lisle-Woodridge case was remanded for various reasons, including potential consideration of any antitrust violations, but the case settled after court decisions based on Illinois law. Although Alarm Detection has consistently argued that the Lisle-Woodridge decisions require a finding in its favor, the Seventh Circuit did not engage in an analysis of anticompetitive effect or address any of the legal doctrines on which this Court's verdict is based.

The Court ordered supplemental briefing to address the Fisher line of cases as the parties had not addressed it in their trial briefs.

It has taken too long to reach a final judgment in this case. The case would have benefited from clearer thinking earlier in the proceedings about what facts, case law, and legal doctrine would ultimately prove to be dispositive-most notably the Fisher line of cases which the parties never addressed until ordered to do so in supplemental post-trial briefing.